STATE of Minnesota, Respondent,

v.

Lloyd Allan THUNBERG, Appellant.

No. C3–91–134.

Supreme Court of Minnesota.

Nov. 20, 1992.

John Stuart, State Public Defender, Susan L.P. Hauge, Asst. State Public Defender, Minneapolis, for appellant.

Michael Freeman, Hennepin County Atty., J. Michael Richardson, Asst. County Atty., Minneapolis, Hubert H. Humphrey, III, Atty. Gen., St. Paul, for respondent.

KEITH, Chief Justice.

Defendant, Lloyd Allan Thunberg, was found guilty by a district court jury of second-degree felony murder. His conviction was affirmed by the court of appeals. *State v. Thunberg*, C3–91–134, 1991 WL 257952 (Minn.App., filed December 10, 1991) (unpublished opinion). We granted review. Defendant argues that (1) the trial court committed prejudicial error by using the words *"sober* person of ordinary self-control" in the jury instruction on heat-of-passion manslaughter; (2) the trial court abused its discretion by permitting inquiry into the facts underlying a prior conviction used to impeach defendant's credibility; and (3) the evidence was insufficient as a matter of law to sustain the conviction for second-degree felony murder.

On December 31, 1989, defendant killed Katherine Jones in their duplex in northeast Minneapolis, stabbing her at least four times. Jones died from exsanguination as a result of the stab wounds.

Jones and defendant had been dating for approximately seven years, but their entire relationship was fraught with conflict. Each accused the other of physical and emotional abuse, and Jones often kicked defendant out of the house, sometimes so she could be with other men. In November 1989, however, after defendant came home from the hospital following surgery, Jones told defendant that she wanted to divorce her incarcerated husband and marry him. This prospect excited defendant, but within a month, the relationship again turned sour.

Just before Christmas, defendant learned that Jones was seeing one of his best friends, Mike Jensen. The day after Christmas, defendant learned that Jones and Jensen had gone up north together. Defendant was very distraught and spent much of the week drinking and crying. His friends repeatedly told him to forget about Jones, but defendant said he still wanted to make the relationship work.

On the morning of December 31, Lillian Belcourt, Jones' sister, told defendant that Jones had called and indicated that she was moving up north with Mike Jensen. The defendant said that he already knew this because he had talked to Jones. Defendant testified that he felt like dying and even started to cut his wrists before a roommate, Joe Barrett, stopped him.

About an hour later, Jones arrived at the duplex with Jedediah, their 15–month–old son. Shortly after Jones told him to leave, defendant ran into the kitchen and hit Jones in the head with his fist. Belcourt then pushed him into the living room, where Barrett and Junior, Jones' brother, restrained him while Jones left the house.

Later that evening, Belcourt, Jones, and Jedediah returned to the duplex, along with Jensen. Soon after they arrived, defendant woke up and came into the kitchen, mumbling something. After taking out a knife from a kitchen drawer, he ran at Jones, stabbing her four times in the abdomen and face. Belcourt went into the bedroom to call 911. Jones crawled to the bedroom and passed out.

Meanwhile, Jensen briefly held defendant back with a chair. Defendant never said anything but jabbed the knife at Jensen's chair a few times. Defendant testified that he did not remember the stabbing but noticed the blood and heard Jensen say to him, "You crazy, bastard. You stabbed her." At that time, defendant remembered holding a red-handled knife, which he subsequently stuck in the front porch as he left.

Upon leaving, defendant initially ran upstairs and told his neighbors that he had stabbed "his old lady." After they threw him out, he wandered for awhile before arriving up at Eunice Stimac's apartment. Around 11:00, while still at Stimac's, defen-

dant called the police and told Officer Jorgensen, "I killed my old lady." Defendant asked to speak to Sergeant Hussman, who arrived at the station a few minutes later and spoke to defendant several times. The police traced one of the calls to Stimac's apartment and arranged to have the apartment surrounded. When defendant voluntarily left the apartment and got into a car, Hussman approached the car and arrested him.

Defendant was taken to the hospital for tests. While at the hospital, he asked Dr. Smith how Jones was doing. Dr. Smith told him that she was dead and that "whoever stabbed her killed her." Defendant said that he had killed her. Defendant's hospital blood tests revealed that his blood alcohol content was .24, and his toxicology expert testified at trial that it could have been between .26 and .28 at the time of the stabbing.

## I.

■ Defendant argues that the trial court committed prejudicial error in its instruction on heat-of-passion manslaughter. Minn.Stat. § 609.20(1) (1990) provides that one commits first-degree heat-of-passion manslaughter if one:

intentionally causes the death of another person in the heat of passion provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances, provided that the crying of a child does not constitute provocation[.]

CRIMJIG 11.19, the recommended jury instruction, provides:

The statutes of Minnesota provide that whoever intentionally causes the death of a human being in the heat of passion provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances [provided that the crying of a child does not constitute provocation] is guilty of manslaughter in the first degree.

At the request of the prosecutor and over the objection of defense counsel, the trial court changed the wording of the recommended instruction to read *"sober* person

of ordinary self-control under like circumstances." (Emphasis added).

The court of appeals, approving of this, reasoned that the standard adopted by the legislature is the "reasonable person" standard and that such a person is a sober person. It further concluded that even if it was error to so instruct the jury, any error was harmless because the jury rejected defendant's "intoxication defense" with respect to the murder charges and therefore must have decided that defendant was "functionally sober" (this despite defendant's blood alcohol content of somewhere between .24 and .28 at the time of the stabbing).

We disagree with the court of appeals' conclusion that the instruction is a proper instruction.

The traditional approach of the courts that have considered this issue is that the adequacy of provocation is to be judged from the perspective of the reasonable sober person. 2 W. LaFave and A. Scott, *Substantive Criminal Law* § 7.10(b)(10) (1986). *See, e.g., Bishop v. United States,* 107 F.2d 297, 302–03 (D.C.Cir.1939) ("If a defendant is intoxicated, there is no requirement that provocation for 'heat of passion' be greater than that that would arouse a reasonable, sober man to act.").

However, as LaFave and Scott point out, there has been movement in the criminal codes away from the strictly objective reasonable person test for determining the adequacy of provision. The Model Penal Code provides for reduction from murder to manslaughter if the killing was "committed under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation or excuse," with reasonableness to be "determined from the viewpoint of a person in the actor's situation under the circumstances as [the actor] believes them to be." Model Penal Code § 210.3 (Official Draft and Revised Comments 1980). The comment to this section states in relevant part:

The critical element in the Model Code formulation is the clause requiring that reasonableness be assessed "from the viewpoint of a person in the actor's situa-

tion." The word "situation" is designedly ambiguous. On the one hand, it is clear that personal handicaps and external circumstances must be taken into account. Thus, blindness, shock from traumatic injury, and extreme grief are all easily read into the term "situation." This result is sound, for it would be morally obtuse to appraise a crime for mitigation of punishment without reference to these factors. On the other hand, it is equally plain that idiosyncratic moral values are not part of the actor's situation. * * * The Model Code endorses a formulation that affords sufficient flexibility to differentiate in particular cases between those special aspects of the actor's situation that should be deemed material for purpose of grading and those that should be ignored. There thus will be room for interpretation of the word "situation," and that is precisely the flexibility desired. There will be opportunity for argument about the reasonableness of explanation or excuse, and that too is a ground on which argument is required. In the end, the question is whether the actor's loss of self-control can be understood in terms that arouse sympathy in the ordinary citizen. Section 210.3 faces this issue squarely and leaves the ultimate judgment to the ordinary citizen in the function of a juror assigned to resolve the specific case.

Model Penal Code § 210.3 commentary (Official Draft and Revised Comments 1980). In other words, the Model Penal Code leaves it to the parties to argue the relevance of the defendant's intoxication to the issue of whether adequate provocation exists.

According to LaFave and Scott, a "substantial minority" of the modern criminal codes contain a provision "along these lines," although some of the provisions, while not following the strictly objective traditional test, "seem less subjective than the Model Penal Code provision." This middle category includes those provisions such as Montana's ("from the viewpoint of a reasonable person in the actor's situation") and Oregon's ("from the standpoint of an ordinary person in the actor's situation").

Minnesota's first-degree manslaughter statute fits in this middle category. The advisory committee comment to section 609.20 supports this conclusion:

A standard is given by the recommended clause by which to measure the kind of provocation required to bring the cause within the section. The usual test developed by courts is whether a reasonable man under like circumstances would be so provoked. The situations principally recognized are: assault, finding a spouse in an act of adultery, seduction of daughter, rape of close relative, and a few others. Words and civil trespasses are not considered sufficient provocation. * * * The recommended section is broader than this and meets the criticism commonly made of present law. A death caused by one in a high emotional state should not be treated the same as murder.

Minn.Stat.Ann. § 609.20 Advisory Committee Comment (West 1987) (citations omitted).

In any event, the committee drafting the statute presumably had before it all the various possible versions, including the "sober person" standard used by courts as well as the Model Penal Code standard, and it chose to recommend the adoption of the general "person of ordinary self-control under like circumstances" standard. For this court to change this to "sober person of ordinary self-control under like circumstances" would be to legislate judicially an element of a criminal offense, something which under the separation-of-powers doctrine we do not have the authority to do.

■ While we believe that the trial court should not depart from the wording of the statute—*i.e.*, should follow the recommended CRIMJIG language—we do not believe that the giving of the modified instruction in this case requires a new trial. First of all, it is debatable whether the jury should even have been given a "heat-of-passion" manslaughter instruction. The evidence indicated that defendant had known for approximately a week before

the stabbing that the victim was seeing another man. In addition, the victim said and did nothing to defendant before the incident, and defendant claimed that he was in a blackout during the stabbing. Thus, there was little or no evidence indicating that any external circumstances could have provoked a person of ordinary self-control to kill in the "heat of passion." *See State v. Swain,* 269 N.W.2d 707, 715 (Minn.1978) (holding that a "mere finding that the defendant was angry, without some evidence of the victim's acts or words, is insufficient to support a finding of 'heat of passion' manslaughter"). In applying harmless error analysis, we posit a reasonable jury, and such a jury could not have reasonably determined, under the standard CRIMJIG instruction, that a person of ordinary self-control would have been provoked to kill under like circumstances. Thus, any error was harmless and could not have prejudiced the defendant.

## II.

■ Defendant also contends that the trial court committed prejudicial error when it permitted the prosecutor to inquire into defendant's claim of blackout during a prior felony. Before trial, the court ruled that if defendant testified, his prior conviction could only be used to impeach his credibility. At trial, defendant admitted that he had a prior conviction for aggravated robbery in 1979 and testified on direct that he could not remember stabbing Jones because he had blacked out.

On cross-examination, defendant stated that he had experienced many blackouts in his lifetime but "never have I ever been in this kind of situation." After overruling defense counsel's objection, the trial court allowed the prosecutor to ask defendant whether he had told the probation officer, upon pleading guilty for aggravated robbery, that he could not remember what had happened because he was in a blackout.

Under Minn.R.Evid. 609, the state may impeach a witness's credibility with evidence of prior convictions if the crime:

(1) was punishable by death or imprisonment in excess of one year * * * and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect, or

(2) involved dishonesty or false statement, regardless of the punishment.

Minn.R.Evid. 609(a). In determining whether to admit evidence of prior convictions under the first prong, courts should apply the five-factor test set forth in *State v. Jones,* 271 N.W.2d 534, 538 (Minn.1978). Under this test, the trial court did not abuse its discretion in admitting the prior conviction.

Nevertheless, the defense argues that the prosecutor's inquiry went beyond proper impeachment by eliciting the underlying fact of defendant's blackout during a prior felony, thereby intimating that defendant was feigning a blackout to negate his culpability. Although inquiry into underlying facts is normally impermissible, such questioning may be allowed where the defendant "opens the door" to such testimony. *State v. Edwards,* 343 N.W.2d 269, 273 (Minn.1984). In this case, the prosecutor asked only one impeachment question in response to defendant's assertion, "I have been through many, many blackouts and never have I ever been in this kind of situation." The state did not inquire into any other details underlying the prior robbery, and the court, in its jury instructions, provided a proper cautionary instruction to the jury, emphasizing that the previous conviction should only be considered for credibility purposes. We hold that no error was committed.

## III.

■ Finally, the defendant claims that the evidence was insufficient as a matter of law to support defendant's conviction. In reviewing a claim of sufficiency of the evidence, this court is limited to ascertaining whether, given the facts in the record and any legitimate inferences that can be drawn from these facts, a jury could reasonably conclude that appellant was guilty of the offense charged. *State v. Merrill,* 274 N.W.2d 99, 111 (Minn.1978). This

court cannot retry the facts and is "limited to a painstaking analysis of the record to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989) (citation omitted).

 Under Minnesota law, a defendant will be found guilty of second-degree felony murder if he "[c]auses the death of a human being, without intent to effect the death of any person, while committing or attempting to commit a felony offense * * *." Minn.Stat. § 609.19(2) (1990). Defendant asserts that his conviction must be vacated because his level of intoxication prevented him from forming the requisite intent. While voluntary intoxication "may" be considered in determining whether a particular intent or state of mind existed at the time, *see* Minn.Stat. § 609.075 (1990), defendant's blood alcohol content of .24 does not compel the conclusion that he could not form a specific intent. *See State v. Olson*, 298 Minn. 551, 552, 214 N.W.2d 777, 778 (1974) (holding that defendant's blood alcohol content of .29 did not negate his ability to form the intent to commit assault with a dangerous weapon). Moreover, the evidence indicates that defendant's "blackout" was selective: he claimed that he could not remember the stabbing, but he remembered being in the doorway between the kitchen and the dining room immediately after the stabbing and knew that he was holding a red-handled knife. *See State v. Buchanan*, 431 N.W.2d 542, 550 (Minn.1988). Defendant also voluntarily confessed to several people, including his upstairs neighbors, Eunice Stimac, the police, and the hospital doctor, telling each of them that he had killed Jones. Under the circumstances, we have no hesitancy in concluding that the evidence was sufficient to sustain defendant's conviction.

Affirmed.