**STATE of Minnesota, Respondent,**

v.

**Kurt Thomas BIRD, Appellant.**

No. A06–888.

Supreme Court of Minnesota.

July 12, 2007.

John M. Stuart, State Public Defender, Steven P. Russett, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Lori Swanson, Attorney General, St. Paul, MN, Michael O. Freeman, Hennepin County Attorney, Jean E. Burdorf, Assistant Hennepin County Attorney, Minneapolis, MN, for Respondent.

## OPINION

ANDERSON, PAUL H., Justice.

A Hennepin County jury convicted Kurt Thomas Bird of one count of first-degree premeditated murder and one count of first-degree domestic abuse murder for the shooting death of his wife. The jury declined to find that Bird committed the lesser-included offense of heat-of-passion manslaughter. Before his trial began, Bird moved to introduce expert psychiatric testimony that he was experiencing psychotic symptoms before and immediately after the shooting and that he was "acutely psychotic" at the time of the shooting. Bird proffered the expert testimony in order to explain his mental state at the time he made inculpatory statements to the police and to help the jury understand "[his] circumstances" at the time of the shooting so the jury could determine whether he acted in the heat of passion or with extreme indifference to human life. The court allowed Bird's expert to testify, but only on the topic of Bird's psychosis at the time he spoke to the police. On appeal, Bird argues that the district court abused its discretion when it excluded expert psychiatric testimony on his psychosis at the time of the shooting. We affirm.

At approximately noon on Tuesday, August 2, 2005, the police responded to a 911 call concerning an apparent suicide at an apartment building in Champlin, Minnesota. Outside the building, Sergeant Chris Larrabee encountered appellant Kurt Thomas Bird, who later identified himself as the victim's husband, and D.B., the brother of Bird's ex-girlfriend. Larrabee asked Bird if he was the person who had found the victim's body, and Bird responded that it was not "quite like that." Bird then told Larrabee that he and his wife had argued at 7 a.m., that his wife had brought out a gun, and that in the course of an ensuing struggle, the gun discharged and she was shot. On entering the Birds' apartment, Larrabee and two other officers found Laurie Bird's body face-down on a bed with a gunshot wound to the back of the head. Her head was near the pillows, and she had a .45–caliber semiauto-

matic gun in her hand above her head. The officers observed no signs of a struggle in the bedroom or elsewhere in the apartment.

### Bird's Interrogation, Arrest, and Pre–Trial Proceedings

The police took Bird to a Brooklyn Park detention facility, where two officers later interviewed him for approximately two hours. During the videotaped interview, Bird told the officers that on the evening of August 1, he and his wife were in their bedroom arguing about whether she had molested his two daughters from a previous relationship. He said that his wife made a remark that indicated that she had sexual relations with one of them. He said that this remark made him angry and caused him to go to the living room to get away from his wife.

In the first part of the interview, Bird told the officers that during the early morning hours on August 2, he and his wife were "bickering back and forth" again regarding Bird's daughters. He said that when he walked from the living room into the bedroom, he saw his wife sitting on the bed, holding one of his guns. He stated that she "kept fooling at her head with [the gun]" and that he did not think the gun was loaded. Later in the interview, Bird said that when he walked from the living room to the bedroom he initially thought his wife was asleep, but he found her sitting on the bed with the gun. He said his wife told him she wished she were dead and that she was "dead already" because she was HIV-positive. He said that his wife told him she was in love with another man and that she was going to leave Bird. Bird told the officers that he thought his wife was involved in more than one extramarital affair and that he must be HIV-positive because of her.

Bird stated that after seeing his wife with the gun, he worked his way behind her in order to take the gun from her. He said that in his effort to get the gun, he "pushed her down and she had the gun and [he] had the gun and the next thing you know it went off." At one point in the interview, Bird said that his wife's hands might have been on the gun when it discharged, but he later told the officers that he was the only person holding the gun at the time of the shooting. He admitted shooting his wife, but said he did not pull the trigger. He said that after the shot was fired, he dropped the gun and it fell onto his wife's hand. He denied pointing the gun at his wife, and he said he did not remember placing the gun in her hand after she was shot. Bird vehemently denied shooting his wife on purpose and denied shooting her out of anger. But he did acknowledge that he was angry at her, that he felt "a little" betrayed and disappointed by her, and that both he and his wife were mad at the time they struggled over the gun.

Following his interview with the police, Bird was charged with the murder of his wife. A Hennepin County grand jury subsequently indicted him on one count of first-degree premeditated murder in violation of Minn.Stat. § 609.185(a)(1) (2006), one count of first-degree domestic abuse murder in violation of Minn.Stat. § 609.185(a)(6) (2006), and one count of second-degree murder in violation of Minn. Stat. § 609.19, subd. 1(1) (2006).

Bird pleaded not guilty to all three counts and gave notice to the state that he intended to assert a mental illness defense. The court then ordered Bird to undergo a Rule 20 evaluation,[1] which resulted in an

---

**1.** *See* Minn. R.Crim. P. 20.01, 20.02 (setting forth procedures for court-ordered examina-

tions to determine whether a defendant is

opinion by Dr. Kristine Kienlen that Bird was competent to stand trial and that he did not qualify for a mental illness defense. Bird did not challenge Dr. Kienlen's findings and did not interpose a plea of not guilty by reason of mental illness. But he moved the court to allow expert psychiatric testimony that he was experiencing psychotic symptoms from approximately July 27 through August 3 and that he was "acutely psychotic" at the time of the shooting. The court allowed Bird's expert to testify, but only about Bird's mental state at the time of his on-scene statements to the police and the subsequent custodial interview.

### Trial Testimony

#### Forensic and Police Testimony

Bird's jury trial began on February 2, 2006. One of the state's first witnesses was Gary Gendron, a crime lab technician for the Hennepin County Sheriff's Department. Gendron testified that the bullet that killed Laurie Bird entered the mattress on which her body was found at approximately a 45–degree angle. He said that the bullet moved on a trajectory from the foot of the bed toward the head of the bed, ultimately lodging in the bottom layer of the mattress. He stated that Laurie Bird's hand was "kind of folded around the weapon" when he removed the gun from the scene.

Dr. Daniel Davis, a forensic pathologist with the Hennepin County Medical Examiner's Office, testified that the cause of Laurie Bird's death was a contact wound to the head. As to the manner of Laurie Bird's death, Davis testified that in his opinion, the shooting was a homicide. He said that Bird's assertion that the gun fell into his wife's hand after accidentally discharging in a struggle was "unbelievable." [2]

Kurt Moline, a forensic scientist and firearms examiner with the Minnesota Bureau of Criminal Apprehension, told the jury that the gun had three separate safety mechanisms designed to prevent accidental firings and that all three mechanisms were functional when he tested the gun. Moline also stated that based on the tests he conducted, the gun was not capable of discharging as a result of a blow or jar and would only discharge if the trigger were pulled.

Detective Kevin Wagman testified about the events leading up to Bird's interview with the police. The state then played a videotape of the interview for the jury. After playing the videotape, the state resumed its questioning of Wagman, who testified that after the interview, the police investigated some of Bird's statements. Based on their investigations, the police determined that Bird's wife had not molested his daughters, was not having any extramarital affair, and was not HIV-positive. Wagman also testified that Bird had two prior domestic assault-related convictions, including one in 1995 for assaulting his wife.

#### Marriage Relationship Testimony

L.T., Laurie Bird's sister, testified that her sister's seven-year marriage to Bird was not always harmonious. She said that the couple separated in 2003 when Bird was drinking heavily and Laurie Bird was hospitalized following a suicide attempt. L.T. said that the couple reunited in 2004, but that at the time Laurie Bird died, she

---

competent to stand trial and whether he qualifies for a mental illness defense).

**2.** Diane Nelson, a latent print examiner with the Hennepin County Sheriff's Office crime lab, testified that there were no "useable" fingerprints on the gun taken from Laurie Bird's hand or on the spent or live rounds in evidence.

was in the process of moving out because Bird was drinking again. L.T. told the jury that Laurie Bird spent the weekend immediately before her death with L.T. and other family members at L.T.'s lake home. L.T. said that Bird, who was out of town on Friday, July 29, called Laurie Bird's cell phone and argued with her that she should not travel to L.T.'s lake home on Saturday but should instead wait until Sunday.[3] L.T. said she saw Bird when she returned from the lake on Sunday evening and that he appeared "normal."

On cross-examination, L.T. testified that in the early evening of Friday, July 29, Bird telephoned to tell her that she needed to go to the Birds' apartment because Laurie Bird had overdosed and was having convulsions. L.T. said that she immediately started driving to the apartment and telephoned her sister en route, hoping that a paramedic would answer. L.T. told the jury that her sister answered the telephone and said that there had been no overdose or convulsions. L.T. said that Bird subsequently told her that someone he worked with had given him the information about his wife as a practical joke.

Laurie Bird's friend A.D. testified that the Birds had a "very rocky" marriage. She said that Bird was verbally abusive to his wife and had accused her of having extramarital affairs. A.D. told the jury that Laurie Bird planned to move in with A.D. on the night of August 2. A.D. also said that Bird left cell phone messages for Laurie Bird earlier in the summer, saying that if she moved out, Bird would divorce or kill her. A.D. said that Laurie Bird was looking forward to attending a motorcycle rally in Sturgis, South Dakota, on August 6, but A.D. told Laurie Bird to tell Bird she was not going. Bird had indicated he was upset about his wife making the trip

to Sturgis and A.D. thought Laurie Bird could "buy her[self] some peace" by concealing her plans. Finally, A.D. said that she urged Laurie Bird to stay at A.D.'s home the night before she died because A.D. was concerned for her welfare.

Several other witnesses testified about the abusive nature of the Birds' marriage. One witness told the jury that Laurie Bird called her for help in the summer of 2002 because Bird was choking her. A former community service officer testified that when he was on patrol in 1995, he saw Bird pull Laurie Bird's hair and punch her "really fast and hard" while the two were seated in a parked car.

*Bird's Testimony*

Bird testified on his own behalf. He told the jury that he had worked as a truck driver for approximately 30 years and that he was often away from home for extended periods of time. He said that he met his wife in 1992 and that they moved in together in 1995 and married in 1998. He said that she was taking medication for mental health problems and that she had once tried to commit suicide, which caused him to worry about her while he was on the road. He stated that he had three biological children, including two teenaged daughters with his ex-girlfriend C.B. He said that these daughters lived with C.B. in South Carolina. He told the jury that C.B. and his daughters came to Minnesota during the last week of June 2005 and that he spent time with them in July before heading out on the road.

On Friday morning, July 29, Bird arrived in Texas with a shipment he picked up in California. He said that he thought his boss told him to return home with an empty truck after making the Texas delivery. Bird said that he arrived home on

3. Bird was an over-the-road truck driver, and he left Fargo, North Dakota, on approximately Friday, July 22, to make deliveries in California and Texas.

Saturday evening, July 30, and did not see his wife until she returned from L.T.'s lake home on Sunday evening. He said he could only remember engaging in "small talk" with her after she arrived. He said that his wife went to work on Monday and did not return home until 8:30 p.m. He told the jury that he did not argue with his wife on Monday night, but they did talk about Bird's daughters because he was "under the impression" that something had happened to his daughters during their visit earlier that month. Bird thought that the information about his daughters had come up in conversations with his boss, but he could not really remember how he obtained the information. He said that immediately after confronting his wife about his daughters, he telephoned C.B. in South Carolina, and C.B. told him that they were fine. Bird said he then apologized to his wife and they went to bed.

Bird testified that he could not fall asleep in the bedroom and that he went into the living room to watch television, ultimately falling asleep on the couch. At some point during the early morning while it was still dark, he walked back into the bedroom and saw his wife sitting on the bed with her back toward him, holding one of his guns. He testified that he had unloaded the same gun when he brought it in from his truck on Saturday and that he had left the bullets on top of a dresser in the bedroom. He stated that he did not believe the gun was loaded when he saw his wife holding it, but he wanted to take the gun away from her because he was afraid she would hurt herself.

Bird testified that he approached his wife from behind in an effort to get the gun. He said that by the time he got hold of the gun, he had pushed his wife such that she ended up face down in front of him, half on and half off the bed. He said that when he took hold of the gun, he believed his wife's hand was also on it. He also said that he did not recall pulling the trigger, and he believed his wife's hand was still on the gun when it discharged. Bird told the jury he knew his wife died because he could tell that she was not breathing. He said he did not know why he did not immediately call 911. He remembered leaving the apartment, returning, and leaving again, but he could not remember why he did so. He also remembered telephoning C.B. and C.B.'s brother, and speaking by telephone with his friend T.L.

*Testimony Regarding Bird's Unusual Behavior*

C.B. testified that at approximately 1 a.m. on Saturday, July 30, Bird called her in South Carolina and told her that the Hell's Angels had stabbed and decapitated a mutual friend. Bird told C.B.'s husband, with whom he also spoke, that Bird had seen a videotape of Laurie Bird having sex with the Hell's Angels. C.B. said that she next spoke with Bird by telephone on the afternoon of Monday, August 1. During this conversation, Bird asked C.B. if their daughters were all right after their visit to Minnesota. Bird told C.B. he was concerned about their daughters because his boss had called him to say that Bird's wife had molested them. C.B. told the jury that she immediately spoke with their daughters and determined that they had not been molested.

C.B. testified that Bird telephoned again on the morning of August 2, the day of the shooting. Bird asked C.B. if she remembered the previous night when she and their daughters were with him. When C.B. insisted that she and the girls had been in South Carolina, Bird ended the call. Approximately 10 minutes later, Bird telephoned again because "he had to see if it was real that there had been a bad accident." C.B. then asked where Laurie

Bird was. Bird responded that his wife was at home and that he had her car. C.B. asked where Bird was and he said he did not know. He then told her that his wife was dead. On cross-examination, C.B. said that she spoke to Bird by telephone approximately six times on the morning of August 2. She said that during the later conversations, Bird said he had shot his wife when she was face down and that "nobody was going to molest his kids and get away with [it]."

Bird's friend T.L. testified that Bird telephoned her on the evening of Sunday, July 31, and told her that his boss, using a satellite, Bird's computer, and a chip in Bird's head, was telling Bird what to do. T.L. said Bird also telephoned her at 3 a.m. on Monday, August 1, and told her that he had been poisoned by food at his apartment and that if he ate anything from home he would get sick. T.L. described Bird as "dead calm" during the August 1 conversation and not wild or excited as he would "normally sound when he was on drugs." T.L. said that she and Bird had another telephone conversation early in the morning on the day Laurie Bird died. Sometime later that morning, Bird telephoned T.L. from a payphone saying he thought his wife was dead "by gunshot." When T.L. asked what had happened, Bird said he did not know. She then asked him whether Laurie Bird had committed suicide, and he said he thought so.

Bird's boss K.B. testified that on Friday, July 29, Bird arrived in Texas with a truck shipment from California. K.B. said that instead of driving to Arkansas to pick up another shipment as Bird was supposed to do, Bird headed home with an empty truck. K.B. said that apparently, Bird thought he had a conversation with K.B. in which K.B. directed him to return with the truck empty, but no such conversation occurred. When K.B. learned of Bird's mis-

perception, he became concerned about Bird's safety and instructed him by telephone on Saturday, July 30, to pull off the road and get some sleep. K.B. said that Bird's comments were consistent with previous incidents in which Bird exhibited symptoms of methamphetamine use. K.B. said that Bird sounded "wigged out" during this Saturday call, but less so when they spoke on Sunday and Monday.

*Expert Psychiatric Testimony*

The district court allowed certain testimony from expert psychiatric witnesses. Bird's expert witness was Dr. Thomas Gratzer, a psychiatrist whom the defense retained to evaluate his psychiatric condition at the time of the shooting. Immediately before Gratzer took the witness stand, the court told the jury that it could use Gratzer's testimony only to evaluate Bird's "demeanor and conduct, as well as the content of what [Bird] said during the [police] interview. You may not use this testimony in deciding [Bird's] state of mind at the time of the alleged offense."

Gratzer testified that in his opinion, Bird was suffering from an unspecified psychotic disorder at the time the police interviewed him on August 2. Gratzer explained that psychosis can cause persons to be paranoid, to suffer from disorganized thinking, and to have delusions—that is, beliefs that are false, irrational, illogical, and not based in reality. Gratzer said that Bird's delusions included beliefs that Laurie Bird was molesting Bird's daughters, was having extramarital affairs, and was HIV-positive, and the belief that Bird's boss was running computer programs that caused his wife to have a seizure. Gratzer explained that Bird suffered from paranoid psychosis, which caused him to look less ill and more composed in the videotaped interview than other mentally ill persons might appear because, among other rea-

sons, paranoid psychotics do not volunteer information about their thinking.

On cross-examination, the state asked Gratzer about Bird's history of drug use and its potential impact on Bird's mental health. Gratzer acknowledged that Bird's psychiatric history included a methamphetamine-induced psychosis for which Bird was hospitalized in 2001. Gratzer also said that Bird evidenced psychotic symptoms in March 2005, four months before the shooting. Gratzer said he was not aware of any hospitalization for the March 2005 symptoms or any diagnosis of those symptoms as being drug-induced. Further, Gratzer said that two facts were inconsistent with a conclusion that Bird suffered from methamphetamine-induced psychosis at the time he spoke to the police: (1) Bird's blood did not test positive for methamphetamine at the time he made the statements; and (2) drug-induced psychosis typically follows a person's use of large amounts of methamphetamine, and it was unlikely that Bird could be using sufficiently large amounts without people around him being aware of his use.

The state called Dr. Karen Bruggemeyer, a forensic psychiatrist, to rebut Gratzer's testimony. Bruggemeyer testified that in her opinion, Bird suffered from a methamphetamine-induced psychosis with delusions and hallucinations that "had now fully resolved." She explained that five days is the maximum length of time that methamphetamine use will be discernable through a blood test, but that methamphetamine-induced psychotic symptoms can continue for days, weeks, and in some cases, months after use ends. Bruggemeyer explained that despite the psychotic thoughts Bird had at the time of the police interview, it was possible for him to think and act rationally.

### Jury Verdict and Bird's Appeal

The district court instructed the jury on first-degree premeditated murder, first-degree heat-of-passion manslaughter, intentional second-degree murder, and first-degree domestic abuse murder. The jury found Bird guilty of first-degree premeditated murder and first-degree domestic abuse murder. After concluding that the two counts merged for sentencing purposes, the court sentenced Bird to life in prison. Bird appealed his conviction to our court, arguing that the district court abused its discretion when it excluded expert psychiatric testimony regarding the nature of psychosis in general and the fact that Bird was psychotic at the time he shot his wife.

### I.

■■■ We review a district court's exclusion of expert testimony for abuse of discretion, *State v. Griese*, 565 N.W.2d 419, 425 (Minn.1997), and any error in excluding such testimony is subject to harmless error analysis. *See State v. Quick*, 659 N.W.2d 701, 713 (Minn.2003). When a defendant pleads not guilty by reason of mental illness, expert psychiatric testimony is admissible during the mental illness phase of the defendant's trial to establish that he "was laboring under such a defect of reason that he lacked the capacity to form the intent that was otherwise manifested." *State v. Bouwman*, 328 N.W.2d 703, 705 (Minn.1982); *see also* Minn. R.Crim. P. 20.02, subd. 6(2) (prescribing a bifurcated trial for defendants pleading not guilty by reason of mental illness). Expert psychiatric testimony is *not* admissible during the guilt phase of a trial to establish that at the time of the alleged offense, a defendant lacked the mental capacity to form specific intent or to premeditate. *State v. Brom*, 463 N.W.2d 758, 762–63 (Minn.1990); *Bouwman*, 328

N.W.2d at 704–05. Further, expert psychiatric testimony is not admissible during the guilt phase to show that a defendant did not in fact form the requisite mental state for the offense charged. *State v. Provost*, 490 N.W.2d 93, 98 (Minn.1992).[4]

■ Finally, we have also stated that expert testimony is generally not admissible during the guilt phase of a trial to inform the fact-finder about the general effects of a mental illness, but "[t]here may be a few exceptions." *Id.* at 103. Two such exceptions are (1) the "very rare" circumstance in which a defendant's mental illness is "characterized by the formation of a particular subjective state of mind inconsistent with the pertinent criminal mens rea"; and (2) when a defendant has a past history of mental illness and that history helps "explain 'the whole man' as he was before the events of the crime and before the miasma of after-the-crime rationalizations." *Id.* at 103–04.

Bird argues that notwithstanding our decisions in *Bouwman* and subsequent cases, the district court abused its discretion when it excluded Gratzer's testimony regarding Bird's psychosis at the time he shot his wife. Bird asserts that Gratzer's testimony was admissible because it was not offered on the issue of Bird's mental state and was instead offered to help the jury decide whether Bird acted in the heat of passion and with extreme indifference to human life. Bird also argues that Gratzer's testimony is admissible under both of the exceptions we articulated in *Provost*.

■ Minnesota Statutes § 609.20(1) (2006) provides that anyone who "intentionally causes the death of another person in the heat of passion provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances" is guilty of manslaughter in the first degree. Whether a defendant acted in the heat of passion is a subjective inquiry that focuses on the defendant's emotional state—that is, whether the defendant was actually provoked. *State v. Hannon*, 703 N.W.2d 498, 510 (Minn.2005); *State v. Buntrock*, 560 N.W.2d 383, 386 (Minn.1997). But whether a person of ordinary self-control would be provoked under like circumstances requires an objective analysis. *Hannon*, 703 N.W.2d at 510. Bird argues that the excluded expert testimony is relevant to both the subjective and objective elements of the provocation defense.[5]

### Subjective Element of Provocation

■ Regarding the subjective element of the provocation defense, Bird asserts that a person in a psychotic state can have delusions and yet appear more rational than he actually is, and that Gratzer's testimony would have helped the jury understand that Bird's "dead calm" affect may

---

4. Provost sought to introduce expert psychiatric testimony on the general effects of schizophrenia and the fact that he suffered from the disease. 490 N.W.2d at 104.

5. Bird told police and testified at trial that the shooting was an accident. But the fact that Bird's theory of the case appears logically inconsistent with a heat-of-passion scenario does not necessarily undermine his argument about the excluded testimony. In *State v. Leinweber*, we held that a district court committed prejudicial error when it refused to give a heat-of-passion manslaughter instruc-

tion to the jury, despite the fact that the defendant maintained that he shot his wife by accident while dislodging jammed shells from his rifle. 303 Minn. 414, 415–17, 228 N.W.2d 120, 122–23 (1975). We stated that the refusal to give the heat-of-passion instruction reflected the court's failure "to properly recognize, in this unwitnessed shooting, the jury's task of reconstructing what actually occurred * * * [and its] liberty to credit or reject * * * any part of defendant's testimony." *Id.* at 417, 228 N.W.2d at 123.

have masked his true emotional state. In essence, Bird appears to be concerned that his psychosis eliminated or at least obscured key "cues" the jury could consider in determining whether he was actually provoked—cues such as expressions of anger toward Laurie Bird. The state argues that determining a defendant's emotional state is no different from determining his mental state or mens rea and that accordingly, a jury must evaluate actual provocation based on what the defendant says and does, not on a psychiatrist's opinion.

We agree that there is no meaningful difference between an emotional state and a mental state with respect to the subjective element of the provocation defense. We do not dispute Bird's contention that what a psychotic defendant "says and does" may be an imperfect indicator of that defendant's emotional state. But what a psychotic defendant says and does may be an equally imperfect indictor of what that defendant "has in mind" with respect to intent and premeditation, and Minnesota law unambiguously prohibits expert psychiatric testimony regarding these mental states unless the testimony is offered to establish a mental illness defense. *See Provost*, 490 N.W.2d at 104 (stating that expert testimony concerning the fact and effects of defendant's schizophrenia "added nothing" to the jury's determination of the intent the defendant actually "had in mind"); *Brom*, 463 N.W.2d at 762–63 (reasoning that expert psychiatric testimony is not helpful in deciding either intent or premeditation because both issues are *subjective* and must be inferred from the totality of the circumstances). We therefore conclude that like the mental states of intent and premeditation, the emotional state of heat of passion must be inferred from the totality of the circumstances rather than established through expert testimony.[6]

### Provost *Revisited*

■ Because the foregoing conclusion draws substantial support from but is arguably not mandated by our holding in *Provost*, it is appropriate for us to revisit and comment on *Provost*. We do so in the context of Bird's assertion that expert psychiatric testimony about his alleged psychosis at the time of the shooting is relevant to the jury's determination of whether he acted in the heat of passion. In *Provost*, we acknowledged that under some circumstances, an expert's opinion that a defendant suffered from a particular mental illness could be *relevant* to determining whether that defendant actually harbored a particular mental state. 490 N.W.2d at 99. We likewise accept Bird's argument that under some circumstances, psychiatric

---

6. Bird cites a single California case as authority for the proposition that Gratzer's testimony is admissible on the subjective element of the provocation defense. In *People v. Steele*, the California Supreme Court stated that a defendant could introduce evidence of his "various mental deficiencies" and his psychological dysfunction to prove that he was in fact in the heat of passion when he committed the charged offenses. 27 Cal.4th 1230, 120 Cal.Rptr.2d 432, 47 P.3d 225, 240 (2002) (noting that although diminished capacity has been abolished in California, "diminished actuality" survives). California law permits the introduction of evidence through expert testimony on the issue of whether a defendant formed a requisite mental state, but an expert may not offer an ultimate opinion on whether the defendant actually formed such a mental state, leaving such an inference to the factfinder. *People v. Vieira*, 35 Cal.4th 264, 25 Cal. Rptr.3d 337, 106 P.3d 990, 1007 (2005) (emphasis added). Unlike California, Minnesota does not recognize the doctrine of "diminished actuality" with respect to mental states. *See Provost*, 490 N.W.2d at 98. Consequently, *Steele* offers little support for Bird's contention that we should differentiate between expert psychiatric testimony on emotional states such as heat of passion and mental states such as intent or premeditation.

testimony on the existence and effects of a mental illness may have some tendency to make the existence of an emotional state such as heat of passion "more probable or less probable than it would be without the [testimony]." *See* Minn. R. Evid. 401. But as we noted in *Provost*, relevancy is not the only consideration in determining whether evidence—including expert psychiatric testimony—should be admitted:

> While Minn. R. Evid. 401 adopts a minimal relevancy approach, this is counterbalanced by Minn. R. Evid. 403, which provides that relevant evidence may be excluded if its probative value is substantially outweighed by other considerations, including prejudice and confusion of the issues. * * * Consequently, to conclude that psychiatric testimony may have some relevance to a guilty mind is only the beginning, not the end, of any inquiry into admissibility of that testimony.

490 N.W.2d at 99.

We ultimately concluded in *Provost* that any probative value expert psychiatric testimony might have to a jury in determining whether a defendant actually formed a particular mens rea would be substantially outweighed by the risk that "the jury [would] inevitably take the testimony as an invitation to consider whether the defendant *could or couldn't* [form] a guilty mind." *Id.* at 100. In other words, we concluded that allowing expert psychiatric testimony on the issue of whether a defendant formed a particular mental state would inevitably open the door to jury verdicts influenced by the doctrine of diminished capacity or responsibility—a doctrine not recognized in Minnesota law.

*Id.; see also Bouwman*, 328 N.W.2d at 706 (rejecting doctrine of diminished capacity).

After reexamining the foregoing conclusion in the context of the case before us today, we find no basis for limiting our holding in *Provost* in order to deem Gratzer's testimony admissible. Assuming without deciding that Gratzer's proposed testimony would have probative value in determining whether Bird acted in the heat of passion, we conclude that such value is substantially outweighed by the risk that the testimony would lead the jury to undertake an impermissible inquiry into Bird's capacity to form the intent required for first-degree murder.[7] Accordingly, we conclude that Gratzer's testimony is inadmissible on the question of whether Bird acted in the heat of passion at the time of the shooting.

### Objective Element of Provocation

■ Bird also argues that Gratzer's testimony is relevant to the objective element of the provocation defense—that is, whether a person of ordinary self-control would have been provoked under like circumstances. In essence, Bird asserts that the "under like circumstances" language of Minn.Stat. § 609.20(1) should be read in conjunction with the "person of ordinary self-control" language to allow the factfinder to consider whether a delusional person of ordinary self-control would have been provoked by words or acts similar to those that provoked the defendant. The state argues that reading "under like circumstances" to encompass a defendant's peculiar mental characteristics undermines the objective element of section 609.20(1) because under such a reading, a defen-

---

7. While we affirm *Provost*'s holding in the context of the case now before us, we acknowledge that in retrospect, some of our statements in *Provost* are not especially persuasive. For example, we stated rather unequivocally in *Provost* that "jurors understand and accept that mental illness is a real illness." 490 N.W.2d at 99. Given the challenges our criminal justice system continues to confront in fairly addressing mental health issues, we believe this statement was more optimistic than circumstances warrant.

dant's conduct would no longer be measured by that of the "person of ordinary self-control."

In *State v. Thunberg*, we held that a district court erred when it used the words "*sober* person of ordinary self-control" in a jury instruction for heat-of-passion manslaughter. 492 N.W.2d 534, 536–37 (Minn. 1992). Following *Thunberg*, we stated in *Buntrock*—another case involving a defendant who was intoxicated at the time of the alleged offenses—that our inquiry focused on whether the victim's conduct "would be sufficient to provoke *an ordinary person under similar intoxicants* in similar circumstances." 560 N.W.2d at 387 (emphasis added). The legislature subsequently amended section 609.20 in 1995 to state that "a 'person of ordinary self-control' does not include a person under the influence of intoxicants or a controlled substance." Act of June 1, 1995, ch. 244, § 13, 1995 Minn. Laws 2326, 2334. Nevertheless, Bird argues that *Thunberg* is still good law to the extent it indicates that "the circumstances a jury may consider generally include the peculiar mental or physical characteristics of the defendant." Bird does not identify any authority for his argument aside from cases involving intoxication, and the extent to which a jury may otherwise consider a defendant's "peculiar" mental characteristics in deciding whether his heat of passion was reasonable appears to be a question of first impression for our court.

Given the absence of Minnesota case law on the foregoing question, we find it helpful to consider the law of other jurisdictions, the traditional formulation of the provocation defense, and the Model Penal Code (MPC) approach. Professor Wayne LaFave observes that "*it is quite uniformly held* that the defendant's special mental qualities—as where, because of a sunstroke or head injury, he is particularly excitable—are not to be considered" when evaluating the adequacy of provocation in heat-of-passion cases. 2 Wayne R. La-Fave, *Substantive Criminal Law* § 15.2(b)(10) (2d. ed.2003) (emphasis added) (footnote omitted). The majority approach described by LaFave reflects the traditional formulation of the provocation defense, under which a defendant's claim that

> he reacted [to an external stimulus] because of his behavioral predisposition itself sets him at odds with the reasonable person standard. Thus, under the traditional approach to provocation, the defense operates through consideration of [stimuli] external to the psyche or behavioral propensities of the defendant, rendering his infirmities irrelevant to whether he was actually provoked, and at odds with the reasonableness inquiry that follows.

Nita A. Farahany & James E. Coleman, Jr., *Genetics and Responsibility: To Know the Criminal from the Crime*, 69 Law & Contemp. Probs., Winter/Spring 2006 at 115, 157.

In contrast to the traditional formulation, the MPC approach, according to some observers, "introduc[es] the actor's actual state of mind into the previously rigidly applied provocation defense by allowing the trier of fact to evaluate reasonableness from the viewpoint of the actor." *Id.* But the language of MPC § 210.3(1)(b) is considerably different from Minn. Stat § 609.20(1). Model Penal Code § 210.3(1)(b) provides that manslaughter is a homicide

> committed under the influence of extreme mental or emotional disturbance for which there is reasonable explanation or excuse. *The reasonableness of such explanation or excuse shall be determined from the viewpoint of a person*

*in the actor's situation* under the circumstances as he believes them to be. (Emphasis added.) Moreover, we have previously compared section 609.20(1) to the foregoing MPC language and concluded that Minnesota's manslaughter statute allows for less subjectivity in the reasonableness determination. *Thunberg,* 492 N.W.2d at 536–537.

In light of the foregoing analysis, we agree with the state's reasoning that interpreting the phrase "under like circumstances" in section 609.20(1) to encompass the unique mental characteristics of a particular defendant would too greatly infringe on the objective element of section 609.20(1). *See Hannon,* 703 N.W.2d at 510 (discussing the subjective and objective elements of the provocation defense under section 609.20(1)). Because the reasonableness of a defendant's provocation is an objective determination, the jury must necessarily ask whether ordinary persons of reasonable self-control—not psychotic persons of reasonable self-control—would be provoked under similar circumstances. We therefore conclude that the district court did not abuse its discretion when it ruled that Gratzer's testimony is inadmissible on the question of whether Bird was reasonably provoked to a heat of passion by words or acts preceding the shooting.

## II.

We next address Bird's claim that expert psychiatric testimony is admissible on a particular element of domestic abuse murder as defined by Minn.Stat. § 609.185(a)(6). Section 609.185(a)(6) provides that a person is guilty of murder in the first degree if he

> causes the death of a human being while committing domestic abuse, when [he] has engaged in a past pattern of domestic abuse upon the victim or upon another family or household member and the

death occurs *under circumstances manifesting an extreme indifference to human life.*

(Emphasis added.) Bird argues that in determining whether he shot his wife under circumstances manifesting extreme indifference, the jury would have been helped by Gratzer's testimony that Bird suffered from a condition causing hallucinations, delusions, and disorganized thinking. More specifically, Bird asserts that Gratzer's testimony would have illuminated whether Bird "knew of and consciously disregarded the risk of causing his wife's death." The state argues that extreme indifference is a state of mind that the jury must infer from the circumstances surrounding the crime and that expert psychiatric testimony should not be admissible on the issue of extreme indifference when it is inadmissible on other states of mind, such as premeditation and intent.

We conclude that the phrase "circumstances manifesting an extreme indifference to human life" in section 609.185(a)(6) denotes recklessness or at minimum, gross negligence—both of which are mental states. *See State v. Schmitz,* 559 N.W.2d 701, 704 (Minn.App.1997) (reasoning that the use of "indifference" in the state's domestic abuse murder provision "suggests a lack of concern and is related to negligence or recklessness"), *rev. denied* (Minn. Apr. 15, 1997); *see also* Margaret C. Hobday, Note, *A Constitutional Response to the Realities of Intimate Violence: Minnesota's Domestic Homicide Statute,* 78 Minn. L.Rev. 1285, 1292–93 (1994) ("Although the meaning of [the extreme indifference clause] invites some confusion, it appears to signify an aggravated form of recklessness." (footnote omitted)).

Furthermore, we can identify no basis for admitting expert testimony as to the effects of psychosis on a defendant's capac-

ity for negligence or recklessness when we categorically exclude such testimony as to the effects of psychosis on a defendant's capacity for specific intent or premeditation. Bird contends that a person responding to psychotic stimuli cannot be acting with the extreme indifference required for a domestic abuse homicide, but he fails to explain why this is so, particularly in light of the well-settled principle that a psychotic person can act with specific intent. *See State v. Wilson,* 539 N.W.2d 241, 245 (Minn.1995) ("[T]his court has only reversed one murder conviction where a defendant suffered from both paranoid schizophrenia and delusions."). Absent a principled basis for treating some states of mind differently from others when determining the admissibility of expert psychiatric testimony, we conclude that the district court did not abuse its discretion when it excluded Gratzer's testimony on the issue of whether Bird acted with extreme indifference to human life under Minn.Stat. § 609.185(a)(6).

### III.

As previously noted, we have identified two exceptions to the rule that expert psychiatric testimony on the general effects of a mental illness is inadmissible. *Provost,* 490 N.W.2d at 103–04. We stated in *Provost* that such testimony *may* be admitted: (1) under the "very rare" circumstance when the defendant's mental illness is "characterized by the formation of a particular subjective state of mind inconsistent with the pertinent mens rea"; or (2) when the defendant has a past history of mental illness and that history helps to explain "the whole man" as he was before he committed the alleged offense. *Id.* Bird argues that Gratzer should have been allowed to testify regarding the general effects of his psychosis under both of the foregoing exceptions.

As to the first exception, Bird asserts that psychosis—which is characterized by the formation of a mental state that includes hallucinations and delusions—is inconsistent with the mental state of "extreme indifference" that the state must prove to secure a conviction for domestic abuse murder. In its simplest terms, Bird's argument appears to be that a person who is psychotic is incapable of acting negligently or recklessly. We disagree because Bird's argument is not supported by our case law. We have long accepted that a psychotic mental state is not inconsistent with specific intent, *see, e.g., Wilson,* 539 N.W.2d at 245, and Bird provides no authority for the proposition that a psychotic mental state is per se inconsistent with negligence or recklessness. More specifically, the fact that Bird suffered from hallucinations, delusions, and disorganized thinking would not appear to prevent him from committing a range of potentially negligent or reckless acts that could have culminated in the shooting of his wife.

As to the second *Provost* exception, Bird asserts that (1) his clinical mental health history includes a diagnosis of and treatment for psychosis; and (2) Gratzer's testimony as to the general effects of psychosis would have helped the jury to put Bird's bizarre conduct in context and thereby understand and appreciate him as he was before the shooting. The state argues that the second *Provost* exception does not apply because, among other reasons, Gratzer's opinions were inconsistent with Bird's pre-indictment clinical record and were therefore inadmissible under *Griese,* 565 N.W.2d 419, and *State v. Persitz,* 518 N.W.2d 843 (Minn.1994).

In *Griese* and *Persitz,* we concluded that the second *Provost* exception does not include the testimony of an expert psychiatric witness whose evaluation of a defendant is based only on post-indictment clinical records. *Griese,* 565 N.W.2d at 426;

*Persitz,* 518 N.W.2d at 848. But Gratzer's evaluation of Bird was based partly on a clinical record, including a 2001 diagnosis of substance-induced psychosis, which preceded the offense. The state asserts that *Griese* and *Persitz* nonetheless prohibit Gratzer's testimony because Gratzer diagnosed Bird as having, in the days before the shooting and at the time Bird gave his statements to the police, an unspecified psychotic disorder rather than a substance-induced psychosis. More specifically, the state asserts that because Gratzer's testimony would have conflicted with the diagnosis in Bird's pre-indictment mental health record, the testimony would not have helped to explain "the whole man."

We conclude that Bird's argument on the second *Provost* exception misses the mark because the expert psychiatric testimony that may be admitted under this exception concerns the defendant's *past history* of mental illness as evidenced by a clinical mental health record. Therefore, to the extent that Bird cites *Provost* as a basis for Gratzer to testify about Bird's psychosis *at the time of the shooting,* he overstates what *Provost* allows. *See Griese,* 565 N.W.2d at 426 (discussing *Provost,* 490 N.W.2d at 103–04).

Having concluded that Bird's proffered expert psychiatric testimony is inadmissible under the second *Provost* exception for the reason set forth above, we need not and do not address the state's argument that Gratzer's testimony is inadmissible because it is inconsistent with Bird's pre-indictment clinical record.

For all of the foregoing reasons, we hold that the district court did not abuse its discretion when it excluded some of Dr. Gratzer's proposed testimony.

Affirmed.