**STATE of Minnesota, Respondent,**

v.

**Timothy James PETERSON, Appellant.**

No. A08–117.

Supreme Court of Minnesota.

May 7, 2009.

Lawrence Hammerling, Chief Appellate Public Defender, Marie Wolf, Assistant Public Defender, St. Paul, MN, for appellant.

Lori Swanson, Attorney General, John B. Galus, Assistant Attorney General, St. Paul, MN; and Robert Raupp, Benton

County Attorney, Foley, MN, for respondent.

## OPINION

MEYER, Justice.

Appellant Timothy James Peterson was convicted of first- and second-degree murder following a bifurcated trial where Peterson pleaded not guilty and not guilty by reason of insanity. He was sentenced to life in prison without the possibility of release. In this direct appeal, Peterson asks us to reverse his convictions based on two issues: (1) the district court violated his due process right under the Minnesota Constitution by prohibiting expert psychiatric testimony in the guilt phase of his bifurcated trial, and (2) Peterson presented sufficient evidence to prove his mental illness defense by a preponderance of the evidence in the mental illness phase of his trial. Alternatively, Peterson asks that his sentence be amended to life in prison with the possibility of release. We affirm Peterson's convictions, and we conclude that the statute mandating a sentence of life in prison without the possibility of release does not apply to Peterson's offense. The correct sentence is life in prison with the possibility of supervised release after 30 years. We affirm as modified.

On March 18, 2005, Howard Hines was shot and killed while seated in the driver's seat of his vehicle, which was parked at his apartment building in Sauk Rapids, Minnesota. A resident of the apartment building discovered Hines inside his car and a number of bullet holes in the windshield. Right before discovering Hines, the resident saw Peterson, another building resident, lean out the window of his third-floor apartment and say, "I'm sorry. I'm sorry. I couldn't handle it anymore." Someone in the apartment building had already called 911.

Peterson also called 911. Disjointedly, he told the operator that he had been having a tough time with people "tunin" his head, he had "lost it," and had shot "one." He said he would be in front of the building when the "cops" came, although the police had already arrived from the earlier 911 call. Peterson came out of the building, where the police immediately handcuffed him. Peterson said that he had "shot him," and that he was "sick of [black people] around here messing with [Peterson]" on the computer. Peterson also told the police that the gun was up in his apartment.

When the police searched Peterson's apartment, they found several shotguns and two rifles. The police also found a chair in front of a bedroom window that faced the apartment parking lot; a large ashtray full of cigarette butts sat on the window ledge. On the floor were four spent gun shell casings, and a fifth spent casing was in the parking lot directly below Peterson's window. These casings were from a .270 caliber rifle, the same type of rifle found in Peterson's apartment.

Interrogations and interviews the same day and shortly after the murder indicated that Peterson had some sort of mental illness. Peterson's answers to police questions often failed to make sense; he talked about things such as being "hooked up" to a system with computers, and people "messing around" with him. But several of Peterson's statements were consistent with other evidence, and Peterson stated several times that he shot the victim. Peterson was charged with first-degree murder, Minn.Stat. § 609.185(a)(1) (2008), and second-degree murder, Minn.Stat. § 609.19, subd. 1(1) (2008).

In July 2005, Peterson's trial was stayed after the district court found that he was incompetent to stand trial pursuant to Minn. R.Crim. P. 20.01, subd. 2. After a number of reevaluations, Peterson was

found competent to proceed on January 3, 2007. Peterson pleaded not guilty and not guilty by reason of insanity; accordingly, the trial would be bifurcated into a guilt phase and a mental illness phase under Minn. R.Crim. P. 20.02.

At a pretrial hearing, Peterson waived his right to a jury trial. At the same hearing, Peterson made a motion in limine on two issues: to allow a diminished capacity defense or, alternatively, to allow expert testimony on his mental illness during the guilt phase of the trial. The motion did not set forth any specific evidence or specific expert testimony that Peterson was trying to admit, but instead relied on the record as a whole. The district court denied the motion for the diminished capacity defense. On the issue of expert testimony, the court found that the offers of proof at that point did not have the "substantial relevance or probative value" to necessitate psychiatric testimony about Peterson's state of mind. The court then said, "[t]hat is not to say that some of that evidence may not be admissible in trial."

The primary contested issue during the guilt phase of the trial was whether Peterson had the intent required for first-degree murder or second-degree murder.[1] Much of the evidence on this issue centered around two interrogations: one done by Officer Eric Norsten the same day as the murder, and the other done two days later by BCA agent Ken McDonald. In the first interrogation, Peterson's answers to Norsten's questions were often disjointed and nonsensical; he spoke most often of himself and others being "hooked up" and "unhooked" from a system. Some of the other themes in his answers included: computers and computer screens, people constantly "playing" and "messing with"

Peterson, and Peterson's inability to "stand it" anymore. Peterson spoke of needing to take his aggression out on somebody, and wanting to "take out" his tormentors. Despite the many nonsensical answers to Norsten's questions, Peterson was able to answer some of Norsten's factual questions in a straightforward way.

Peterson was interrogated a few days later by BCA agent Ken McDonald. Again, Peterson's answers were confusing and unclear, with an increase in profanity and confrontational language. Peterson continued to talk about being played with, programmed, and hooked up, and said he shot the victim because he was "the closest one to me." Peterson again was able to answer many of the purely factual questions, but apparently could not respond meaningfully to questions about why he shot Hines.

Peterson did not call any witnesses after the State rested. The interrogating officers' testimony and the transcripts of interviews described above, however, were admitted to show the surrounding circumstances. The district court found Peterson guilty of first- and second-degree murder.

At the mental illness phase of the bifurcated trial, Peterson was the first to testify. On direct examination, his counsel relied solely on the videotape and the transcript of Norsten's interrogation of Peterson. On cross-examination, Peterson said that he was not talking to the officers during the interrogation, but was "looking at people behind them." When asked why he was crying during the interrogation, Peterson said because he had shot someone who had not done anything to Peterson, and he "felt bad that his body was shot and he was dead."

---

1. Minnesota Statutes § 609.185(a)(1), the first-degree murder statute, requires a defendant to act with "premeditation and with intent to effect the death of the person or of another." Minnesota Statutes § 609.19, subd. 1(1), second-degree murder, requires the "intent to effect the death of that person or another, but without premeditation."

Dr. Gregory Hanson, a forensic psychologist, testified as Peterson's expert witness. Hanson diagnosed Peterson with paranoid schizophrenia, saying that he was exhibiting the typical symptoms in respect to auditory hallucinations, the prominence of paranoia and paranoid delusional beliefs, and mental disorganization. Hanson summarized some of Peterson's most significant delusional beliefs: there were a large number of black-haired individuals, primarily African–Americans, who were controlling and monitoring Peterson through computers and video cameras placed inside flies in his apartment; and he believed that he had been sexually assaulted and that the conspirators could control thoughts and move people's souls from one body to another.

In determining criminal responsibility under the *M'Naghten* standard,[2] Hanson's opinion was that at the time of the crime, Peterson was not laboring under such defect of reason that he did not know the nature of his actions or the wrongfulness of his conduct. Hanson acknowledged there were strong indicators that Peterson should not be held criminally responsible: Peterson's illness had accelerated to the point that he was in a state of acute crisis, anger, and fear; he had no insight into his mental illness; and he believed Hines was allied with the conspirators. Peterson's statements suggest he saw no alternatives, and that the shooting was "a culmination of his paranoid delusional rage." Ultimately, though, Hanson concluded that the preponderance of the psychological evidence did not support Peterson's *M'Naghten* defense because Peterson knew the nature of his acts: he knew he was shooting someone, and although some comments

suggest that he may not have known Hines would truly die, most statements indicated that he understood the essential nature of his action. Hanson also concluded that Peterson knew the wrongfulness of his conduct: his statements show that he was enraged, and he wanted to vent that hostility and aggression. Peterson's tears, his apologies, and his acknowledgment of the consequences suggest that he knew his actions were wrong.

Dr. Rosemary Linderman, a clinical and forensic psychologist testifying for the State, diagnosed Peterson with schizoaffective disorder. She explained that schizoaffective disorder includes the delusional beliefs of schizophrenia, but with a mood component that includes major depression and manic characteristics—in essence, paranoid schizophrenia with more volatility and emotion. Linderman also concluded that Peterson did not meet the *M'Naghten* burden of proof: Peterson's 911 call and report, his statements about taking his anger out on somebody, and his comments about the consequences he faced indicate that Peterson knew the nature of his acts. Linderman further concluded that Peterson's numerous apologies, his knowledge of the consequences, and his acknowledgment of alternative behavioral options supported that Peterson knew his conduct was wrong. The district court found that Peterson had not proven his mental illness defense by a preponderance of the evidence. He was sentenced to life in prison without the possibility of release.

On appeal, Peterson asks us to reverse his convictions based on two issues: (1) the district court violated his due process rights under the Minnesota Constitution

2. In Minnesota, a defendant seeking to establish a mental illness defense is required to meet the *M'Naghten* standard, which is codified at Minn.Stat. § 611.026 (2008). *See State v. McLaughlin*, 725 N.W.2d 703, 708 n. 3 (Minn.2007). The defendant must prove that at the time of committing the charged offense, he "was laboring under such a defect of reason, from a mental illness or deficiency, as not to know the nature of the act, or that it was wrong." *Id.* (citation omitted) (internal quotation marks omitted).

by prohibiting expert psychiatric testimony in the guilt phase of his bifurcated trial, and (2) Peterson presented sufficient evidence to prove his mental illness defense by a preponderance of the evidence in the mental illness phase of his trial. Alternatively, Peterson asks that his sentence be amended to life in prison with the possibility of release.

## I.

 Peterson argues that the district court's denial of his motion to allow expert testimony in the guilt phase of the trial violated his due process right to present a complete defense under the Minnesota Constitution. Alternatively, Peterson argues that the facts of his case fit under the narrow exceptions that have been carved out of the general rule excluding such expert testimony. Evidentiary rulings, including the admission of expert testimony, are within the broad discretion of the district court. *State v. Ritt*, 599 N.W.2d 802, 810 (Minn.1999). Even when a defendant alleges that his constitutional rights were violated, evidentiary questions are reviewed for abuse of discretion. *State v. Profit*, 591 N.W.2d 451, 463 (Minn.1999) (citing *State v. Gustafson*, 379 N.W.2d 81, 84 (Minn.1985)). Whether an evidentiary ruling violates a criminal defendant's rights under the Constitution is a question of law this court reviews de novo. *State v. Caulfield*, 722 N.W.2d 304, 308.

We have stated numerous times that excluding expert psychiatric testimony from the guilt phase of a bifurcated trial does not violate due process. *See State v. Provost*, 490 N.W.2d 93, 104 (Minn.1992); *State v. Brom*, 463 N.W.2d 758, 763–64 (Minn.1990); *State v. Jackman*, 396 N.W.2d 24, 29 (Minn.1986); *State v. Bird*, 734 N.W.2d 664, 675 (Minn.2007). Peterson cites to language in our recent decisions and argues that some language hints at a willingness to reverse course and hold that excluding such evidence violates due process under the Minnesota Constitution.

In *Brom*, we followed precedent in holding that excluding expert testimony does not violate a defendant's right to due process because of the irrelevant nature of such evidence. 463 N.W.2d at 763–64. Although we stated in a footnote that "a different trial record might well persuade us otherwise," *id.* at 763 n. 9, we emphasized that expert testimony is not relevant in determining premeditation or intent because intent must be inferred from the circumstances surrounding a particular crime, to which psychiatric evidence does not relate, *id.* at 762–63.

In *Provost*, we held that exclusion of expert psychiatric testimony on the issue of mens rea is not a denial of constitutional due process. 490 N.W.2d at 104 (citing *Brom*, 463 N.W.2d at 763–64). Although we acknowledged that some psychiatric opinion testimony on the existence and effects of a mental illness may have some relevancy, we ultimately concluded that the probative value of the evidence is low and substantially outweighed by counter-considerations.[3] *Id.* at 102 & n. 8. Factual evidence bearing on a defendant's mentally abnormal condition might be admissible, but any expert psychiatric testimony on

---

**3.** Some of the concerns set forth in *Provost* include: jurors might impermissibly use the testimony as evidence of diminished capacity, which is not a recognized defense in Minnesota. 490 N.W.2d at 100. If expert testimony is admissible to negate mens rea, it is also admissible to affirm mens rea—this will lead to unprofitable disagreements between the experts hired by both sides. *Id.* Further, the Federal Rules of Evidence specifically attempt to eliminate the "confusing spectacle" of competing expert witnesses testifying to contradictory conclusions as to the ultimate legal issue. 409 N.W.2d at 100–01; *see* Fed. R.Evid. 704.

whether the defendant had the requisite mens rea is inadmissible. *Id.* at 102–03.

We qualified that holding by stating that "expert opinion testimony about the general effects of mental illness" is inadmissible, with the following exceptions: (1) the rare situation where there is a mental disorder characterized by the formation of a particular subjective state of mind inconsistent with the pertinent criminal mens rea; or (2) where the defendant has a past history of mental illness and the evidence is in the nature of factual background to explain "the whole man," such as a clinical record where psychiatric opinions appear. *Id.* at 103–04. Our recent decision in *Bird* affirmed the *Provost* holding. *Bird,* 734 N.W.2d at 675.

These cases firmly establish that excluding expert psychiatric testimony from the guilt phase of a bifurcated trial is not a due process violation under the Federal or Minnesota Constitutions. *See Brom,* 463 N.W.2d at 763–64. We affirm *Provost's* rule regarding expert psychiatric testimony—the testimony is inadmissible, unless general mental illness evidence falls under certain narrow exceptions. We next turn to whether the district court abused its discretion when it denied Peterson's motion in limine to allow expert psychiatric testimony based on the narrow exceptions set forth in *Provost.* The court carefully reviewed the evidence and listened to the arguments of counsel. On the record, the court explained that none of the proffered evidence met the requirements of the narrow exceptions we set forth in *Provost.* The court indicated that some evidence on Peterson's state of mind at the time of the murder would potentially be relevant on the question of intent, but the potential for confusion and prejudice precluded any expert testimony to explain Peterson's mental state. The record clearly indicates that the court carefully considered the proffered evidence, analyzed the evidence under the appropriate legal standard, and concluded that the evidence did not meet the narrow exceptions set forth in *Provost.* Further, the court was careful to point out that state-of-mind evidence would be admitted and limited its ruling strictly to the expert conclusions of Peterson's expert psychiatrist. We hold that the district court did not abuse its discretion in denying Peterson's motion in limine to admit expert psychiatric testimony during the guilt phase of his bifurcated trial.

## II.

We next consider whether there was sufficient evidence to prove Peterson's mental illness defense by a preponderance of the evidence. Minnesota has codified the *M'Naghten* standard for a mental illness defense at Minn.Stat. § 611.026 (2008), which requires the defendant to show that "at the time of committing the alleged criminal act the person was laboring under such a defect of reason . . . as not to know the nature of the act, or that it was wrong." A defendant must prove mental illness at the time of committing the crime by a preponderance of the evidence. *DeMars v. State,* 352 N.W.2d 13, 16 (Minn. 1984) (citing *State v. Malley,* 285 N.W.2d 469, 472 n. 3 (Minn.1979)); *see* Minn.Stat. § 611.025 (2008).

When reviewing the record to determine whether a defendant met his burden to prove mental illness, we conduct "a rigorous review of the record to determine whether the evidence, direct and circumstantial, viewed most favorably to support a finding of guilt, was sufficient to permit the trial court to reach its conclusion." *State v. Mytych,* 292 Minn. 248, 252, 194 N.W.2d 276, 279 (1972). We have consistently held that the issue of legal mental illness is a question for the finder of fact, and we have granted the fact finder broad deference in assigning the weight to give

to various testimony. *See State v. Wilson,* 539 N.W.2d 241, 244 (Minn.1995); *Brom,* 463 N.W.2d at 764–65 (listing cases).

Peterson argues that his history of hospitalization, his delusional framework, the nature and severity of his mental illness, and the incomprehensibility of his statements to the police were sufficient proof of legal mental illness. Peterson argues that Hanson, who knew the severity of Peterson's mental illness, applied the *M'Naghten* standard too strictly to Peterson.

We do not agree with Peterson's characterization of Hanson's findings. Hanson considered all of Peterson's statements and actions, acknowledged that the case presented a close question, and ultimately concluded Peterson knew the nature and wrongfulness of his conduct. Even if Hanson's conclusions are disregarded, Linderman's report still supports a finding that the preponderance of the evidence does not support the *M'Naghten* standard for mental illness. Both experts concluded that Peterson understood the nature of what he was doing and that his behavior was wrongful, and both gave evidence to support both prongs. The evidence, viewed in a light most favorable to the verdict, was sufficient to permit the district court to find that Peterson had not proved his mental illness defense.

## III.

At sentencing, the district court imposed a sentence of life in prison without the possibility of release. Peterson argues, and the State concedes, that Peterson's sentence should be amended to life in prison with the possibility of supervised release after 30 years.

Minnesota Statutes § 609.106, subd. 2 (2008), sets forth crimes that warrant a sentence of life without the possibility of release. Subdivision 2(1) states that "[t]he court shall sentence a person to life imprisonment without possibility of release" if that person is convicted "of first degree murder under section 609.185, paragraph (a), clause (1), (2), (4), or (7)." That subdivision, however, did not include paragraph (a), clause (1), until it was amended in 2005; the amendment went into effect August 1, 2005, to apply to crimes committed on or after that date. Act of June 2, 2005, ch. 136, art. 17, § 9, 2005 Minn. Laws 1120, 1127. Before that amendment, convictions for premeditated murder were subject to life imprisonment with the possibility of release after serving a minimum of 30 years. Minn.Stat. § 244.05, subd. 4 (2004); *see State v. Manley,* 664 N.W.2d 275, 278 n. 2 (Minn.2003).

The date of Peterson's charged offense was March 18, 2005. The legislature plainly expressed that the amendment including first-degree premeditated murder under the mandatory life sentence without the possibility of parole would not apply to crimes committed before August 1, 2005. As Peterson was convicted of a crime that occurred before that date, it was improper for him to be sentenced under that statute. *See State v. Lawrence,* 312 N.W.2d 251, 254 n. 1 (Minn.1981). We modify Peterson's sentence to life in prison with the possibility of supervised release after 30 years. *See State v. Zeimet,* 696 N.W.2d 791, 798 (Minn.2005) (reducing sentence to presumptive sentence under the sentencing guidelines).

Affirmed as modified.