**STATE of Minnesota, Respondent,**

v.

**Michael John ANDERSON, Appellant.**

No. A09–1141.

Supreme Court of Minnesota.

Oct. 14, 2010.

Lori Swanson, Attorney General, St. Paul, Minnesota; and Patrick J. Ciliberto, Scott County Attorney, Michael J. Groh, Assistant Scott County Attorney, Shakopee, MN, for respondent.

Robert M. Speeter, Speeter & Johnson, Minneapolis, MN; and Alan D. Margoles, Margoles & Margoles, St. Paul, MN, for appellant.

## OPINION

DIETZEN, Justice.

A Scott County jury found appellant Michael Anderson guilty of first-degree premeditated murder, second-degree intentional murder, and second-degree manslaughter—culpable negligence, for the shooting death of Katherine Olson on October 25, 2007. The district court sentenced Anderson to life in prison without possibility of release, and Anderson filed a direct appeal. We affirm.

On October 26, 2007, the Savage Police Department received a phone call that a discarded purse had been seen at Warren Butler Park in Savage, Minnesota. The responding police officer found the purse, which included Katherine Olson's driver's license, on a garbage bag in a trash can. Subsequently, police spoke with Olson's roommate, who stated Olson told him that she was going to Savage for a babysitting job. A review of Olson's e-mail account indicated that Olson had responded to an e-mail request from "Amy," who lived in Savage, for a babysitter.[1] In the e-mails to Olson, "Amy" claimed that she needed someone to watch her daughter on October 25 from 9:00 a.m. to 2:00 p.m. Olson's cell phone records showed that the last call was an 85–second call on October 25 at 8:57 a.m. to Anderson's cell phone number. Subsequently, police located Olson's vehicle at Kraemer Park Reserve, which is just east of Warren Butler Park. Olson's body was found in the trunk.

The police took custody of Anderson at his place of employment at the Minneapolis–St. Paul airport. Anderson was informed that he was detained as the result of a missing person investigation, and he was then transported to the Savage Police Department for questioning. Prior to the interview, Anderson was read his *Miranda* rights, and he agreed to talk to the officers. During the interview, Anderson admitted that he used the online service, admitted he was present when Olson was killed, and stated a friend of his "thought it would be funny." When Anderson requested an attorney, the interview ended.

The Minnesota Bureau of Criminal Apprehension (BCA) examined Olson's body and the Anderson residence. A hair collected from Olson's body had the same DNA profile as Anderson's DNA profile. DNA analysis of twine knotted around Ol-

---

1. Olson had been looking for jobs as a nanny on an online service of classified ads and discussion forums for jobs, housing, and items for sale, along with personals (the online service).

son's right ankle could not exclude Olson or Anderson as contributors. Anderson's fingerprint was found on the drawstring of the garbage bag in Warren Butler Park. The garbage bag contained a blue towel with blood that matched Olson's DNA profile, and Olson's cell phone contained Anderson's thumbprint. DNA analysis of a blood smear found at the bottom of the stairs in the Anderson residence matched Olson's DNA profile. A Ruger .357 Blackhawk revolver was found in Anderson's parents' bedroom, and a fired cartridge was found in Anderson's room underneath a pillow. A firearms expert determined the revolver fired the bullet found in Olson's body and the cartridge found in Anderson's room. The DNA profile from the revolver matched Anderson's DNA profile.

An autopsy revealed a gunshot wound to Olson's back, and injuries to Olson's knees, nose, and forehead. The medical examiner stated it would be reasonable to conclude that Olson was shot in the back, fell forward, and hit her knees and head. The cause of death was a gunshot wound, and the manner of death was homicide.

The BCA conducted an analysis of the computers at the Anderson residence. Anderson made 67 postings on the online service from November 2006 to October 2007. Those posting included requests for female models and actresses, nude photos, a sexual encounter, babysitters, and car parts. Anderson posted an ad on October 22, 2007, requesting a babysitter for a 5-year-old girl. When Olson responded to the ad, Anderson replied posing as "Amy"

and stated "she" needed someone to babysit her daughter. After several e-mails, Anderson arranged to have Olson come to the Anderson residence on October 25 from 9:00 a.m. to 2:00 p.m. Olson called Anderson's cell phone at 8:57 a.m. on October 25, and Anderson listened to the voice mail at 8:59 a.m.

Anderson was charged with second-degree intentional murder in violation of Minn.Stat. § 609.19, subd. 1(1) (2008). Subsequently a grand jury indicted Anderson for first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2008), and second-degree intentional murder, Minn.Stat. § 609.19, subd. 1(1), for the October 25, 2007, shooting death of Olson. Anderson pleaded not guilty by reason of mental illness. A psychologist and a psychiatrist retained by the defense diagnosed Anderson as having Asperger's disorder (Asperger's).[2] The district court ordered a mental examination of Anderson by a forensic psychologist and a forensic psychiatrist, who both concluded that Anderson did not have Asperger's and was not mentally ill or mentally deficient.[3] Later, Anderson withdrew his mental illness defense, changing his plea to not guilty.

Before trial, Anderson moved to suppress his statement to the police officers on the ground that he did not waive his *Miranda* rights. By order filed November 14, 2008, the district court denied the request.

At trial, Anderson stipulated that he was holding his father's gun when the gun fired, that he caused Olson's death, and

---

**2.** Asperger's is a form of autism that is characterized by "severe and sustained impairment in social interaction ... and the development of restricted, repetitive patterns of behavior, interests, and activities." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 80 (4th ed. text revision 2000).

**3.** Under Minn. R.Crim. P. 20.02, subd. 1, a district court may order a defendant's mental examination if the defense notifies the prosecutor that the defense will assert a mental illness defense.

that he was acting alone when the gun fired. Anderson argued that expert psychiatric testimony should be permitted to show physical and cognitive effects of Asperger's on him. The district court denied Anderson's motion to admit the expert testimony.

The State introduced testimony regarding its investigation and Anderson's statement to police. Also, the State introduced testimony from other inmates that Anderson admitted committing the murder because he wanted to know what it felt like; that Anderson told another inmate, who had been a professional fighter, that he would be more famous than the other inmate because of the high profile label the media used to describe Olson's murder; and that Anderson said he did not plead insanity "[b]ecause then I would have to pretend that I'm sorry." Anderson attempted to prove through other witnesses that he was clumsy, that there was some clutter in the house, and that the gun may have discharged accidentally as Olson was running away. Anderson did not testify at trial.

The jury found Anderson guilty on all counts. The district court sentenced Anderson to life in prison without possibility of release. On direct appeal, Anderson argues that (1) he did not waive his *Miranda* rights so his statement to the police should have been suppressed; (2) the district court abused its discretion and denied him a fair trial when it denied his request to present expert psychiatric testimony on Asperger's and its effects on him; (3) the court abused its discretion by denying Anderson's proposed jury instructions; and (4) the evidence was insufficient to support a conviction for first-degree premeditated murder.

## I.

■ Anderson argues that he did not knowingly, intelligently, and voluntarily waive his *Miranda* rights prior to making a statement to law enforcement officers and therefore the district court erred by not suppressing the statement to the police. We review findings of fact surrounding an alleged *Miranda* waiver for clear error, and we review de novo the legal conclusions based on those facts to determine whether the waiver was knowing, intelligent, and voluntary. *State v. Burrell,* 697 N.W.2d 579, 591 (Minn.2005).

■ The Fifth and Fourteenth Amendments to the U.S. Constitution prohibit the government from compelling a person to testify against himself. U.S. Const. amends. V, XIV; *see also State v. Clark,* 738 N.W.2d 316, 331 (Minn.2007). If a criminal suspect faces custodial interrogation, the suspect must be informed that the suspect has a right to remain silent and has a right to speak with an attorney. *Miranda v. Arizona,* 384 U.S. 436, 467–73, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A suspect may waive these rights if the suspect does so knowingly, intelligently, and voluntarily. *Id.* at 444, 86 S.Ct. 1602; *Clark,* 738 N.W.2d at 332. The State has the burden of establishing, by a preponderance of the evidence, that a defendant's waiver of *Miranda* rights was knowing, intelligent, and voluntary. *State v. Ganpat,* 732 N.W.2d 232, 240 (Minn. 2007). The State meets its burden of proving a knowing, intelligent, voluntary waiver of *Miranda* rights if it shows the "*Miranda* warnings were given and that the individual stated that he or she understood those rights and then gave a statement." *State v. Camacho,* 561 N.W.2d 160, 168 (Minn.1997). Where an appellant claims that there is credible evidence that a waiver was invalid, we make a subjective factual inquiry, look at the totality of the circumstances, and consider factors such as the defendant's age, maturity, intelli-

gence, education, experience, ability to comprehend, lack of or adequacy of warnings, the length and legality of the detention, the nature of the interrogation, any physical deprivations, and limits on access to counsel and friends. *See Ganpat,* 732 N.W.2d at 240–41; *Camacho,* 561 N.W.2d at 168.

The district court found that police detectives told Anderson at the airport that they were conducting a missing person investigation, and wanted him to accompany them to the Savage police station. Before the interview at the police station, a detective read the *Miranda* warning to Anderson, after which Anderson was asked, "Do you want to talk to us now?" Anderson responded with "What's this about?" and "I'd like to know what's going on." Anderson ultimately said, "Okay, I'll talk to you," and the interview began. The interview ended when Anderson requested to speak with an attorney.[4] Further, the court found that Anderson was an adult, was coherent, and did not ask to leave or express discomfort. The court concluded that the *Miranda* warning was properly given, and based on the totality of the circumstances, that Anderson knowingly, intelligently, and voluntarily waived his rights.

Based on our review of the record, we conclude that the findings of the district court are supported by the record. The *Miranda* warning was given to Anderson prior to his statement, and Anderson stated that he understood his rights. Although Anderson was only 19 at the time of the interview and did not have a high school degree, there is nothing to indicate that he did not understand his *Miranda* rights when the warning was read to him. In fact, the detective stopped six separate times when reading the *Miranda* warning to ask Anderson whether he understood his rights. Each time, Anderson indicated he understood his rights, and after the warnings were read, he stated, "Okay, I'll talk to you." The questioning lasted only 24 minutes, and ended when Anderson asked to speak with an attorney. Anderson's unprompted request for an attorney strongly suggests he understood that he had a right to remain silent or request an attorney when the warning was read to him.

At the airport, Anderson was told he would be questioned regarding a missing person investigation. Shortly after his arrival at the police station, he was given the *Miranda* warning. Anderson then asked what the questioning was about, and the officers explained that they were conducting an investigation and needed to talk to him regarding that investigation. Subsequently, Anderson agreed to talk. Given the totality of the circumstances, we hold that the district court did not err in concluding that Anderson knowingly, intelligently, and voluntarily waived his *Miranda* rights.[5]

## II.

Anderson argues that the district court erred in refusing to allow him to present expert testimony to the jury regarding Asperger's, and that the failure to allow this testimony deprived him of a fair trial. We review evidentiary rulings of the district court, including the admission of expert testimony, for abuse of discretion.

---

**4.** The recorded interview began at 11:20 p.m. and ended at 11:44 p.m.

**5.** We have cautioned investigating officers that they should make clear to suspects the nature of the crimes about which they will be questioned. *State v. Beckman,* 354 N.W.2d 432, 437 (Minn.1984). Here, officers informed Anderson at the airport that he would be questioned regarding a missing person case.

*State v. Peterson,* 764 N.W.2d 816, 821 (Minn.2009). But whether an evidentiary ruling violates a defendant's constitutional rights is a question of law we review de novo. *Id.*

■ The admission of expert testimony generally rests within the discretion of the district court. *Id.* The district court in exercising its discretion must determine whether the expert is qualified to provide the testimony, and whether the testimony is helpful because it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Minn. R. Evid. 702. But expert testimony is not helpful if the testimony "is within the knowledge and experience of a lay jury and ... will not add precision or depth to the jury's ability to reach conclusions." *State v. Helterbridle,* 301 N.W.2d 545, 547 (Minn.1980). Thus, "[i]f the jury is in as good a position to reach a decision as the expert," the testimony should not be admitted. *State v. Saldana,* 324 N.W.2d 227, 229 (Minn. 1982). The district court may also exclude expert testimony if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Minn. R. Evid. 403.

■ Essentially, Anderson makes three arguments. First, he argues that evidence of Asperger's is necessary to explain the physical evidence of his condition, such as odd mannerisms, inability to empathize, show remorse, or respond properly to social cues, and also to show its effects on his coordination. According to Anderson, the failure of the district court to allow expert testimony to educate the jury regarding his alleged condition prevented him from testifying, and deprived him of his right to a fair trial.

■■ Anderson has a constitutional due process right to present a meaningful defense. *See State v. Reese,* 692 N.W.2d 736, 740 (Minn.2005). A defendant's constitutional right to a fair trial, however, is shaped by the rules of evidence, which are "designed to assure both fairness and reliability in assessing guilt or innocence." *Id.* While Anderson has a right to introduce evidence that helps explain his conduct to the jury, that right is not unlimited. *See id.; State v. Brechon,* 352 N.W.2d 745, 751 (Minn.1984). The district court may exclude expert testimony without violating a defendant's constitutional rights where, for example, the court concludes that the evidence is not helpful to the jury, or where the probative value of such evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* Minn. R. Evid. 403, 702; *Reese,* 692 N.W.2d at 740; *State v. Koskela,* 536 N.W.2d 625, 629–30 (Minn. 1995).

The district court observed Anderson at the pretrial hearings, reviewed his taped statement, and found nothing particularly unusual about Anderson's physical appearance or mannerisms requiring an explanation at trial. The court observed that "[a]ny manifestations of Asperger's Disorder that [Anderson] has are subtle enough" that Anderson did not previously seek psychological or psychiatric evaluation or treatment. In addition, the court noted that Anderson was not "behaving unusually for a suspect in a murder investigation." The court reviewed Anderson's offer of proof, and concluded that Anderson failed to show how Asperger's impacted his physical abilities and that testimony about Asperger's was unnecessary.[6]

---

**6.** The district court noted that it is disputed whether Anderson has Asperger's, but after examining the evidence in a light most favorable to Anderson, concluded that he "may" have Asperger's.

Based on the district court's observations of Anderson, and the failure of Anderson's offer of proof to show that his alleged Asperger's physically affected him, we conclude the district court did not abuse its discretion when it excluded expert psychiatric testimony. There is no indication expert psychiatric testimony was necessary to explain Anderson's behavior, physical abilities, and his testimony.[7] We agree with the district court that whatever probative value the expert testimony would have had, it was substantially outweighed by the danger of confusing the jury by causing them to speculate on how Asperger's may affect Anderson. We also conclude that Anderson's right to a fair trial was not violated by the district court's ruling.

■ Second, Anderson contends that the district court erred by excluding expert testimony regarding how Asperger's affects him. Anderson asserts that he does not have normal brain function, and by excluding the expert psychiatric testimony, the jurors inferred intent and premeditation based on an irrebuttable presumption that his brain was normal; he argues that he has a right to call witnesses to establish that his brain does not function normally and that he acts and perceives differently than the average person. Moreover, Anderson claims that it is a denial of due process to exclude evidence of mental disability, and even though he withdrew his mental illness defense, forgo-

ing a bifurcated trial, evidence of mental disability must be permitted to challenge whether he had the necessary mens rea.[8] The court cited our prior case law and ruled that expert psychiatric testimony regarding Asperger's effects on forming intent and premeditation was not admissible at trial.

Whether expert testimony is needed in a criminal trial to determine how Asperger's affects the functioning of the brain requires consideration of existing law on the treatment of mental illness in criminal cases. Minnesota Statutes § 611.026 (2008) provides:

> No person shall be tried, sentenced, or punished for any crime while mentally ill or mentally deficient so as to be incapable of understanding the proceedings or making a defense; but the person shall not be excused from criminal liability except upon proof that at the time of committing the alleged criminal act the person was laboring under such a defect of reason, from one of these causes, as not to know the nature of the act, or that it was wrong.

If a defendant asserts a mental illness defense, Minn. R.Crim. P. 20.02, subd. 6(2), requires a bifurcated trial; the first stage of a bifurcated trial is devoted to whether the defendant is guilty, and the second stage of the trial is devoted to the defendant's mental illness or capacity.

---

7. Anderson chose not to testify. He spoke several times with his attorneys about his right to testify, voluntarily waived his right to testify, and when questioned by the court about his decision, he unequivocally indicated that he was satisfied with his attorneys' representation but did not want to testify.

8. In his brief, Anderson claims that the mandatory life imprisonment sentence violates due process when there is an inability to have the district court consider mitigating evidence

at sentencing. This argument, however, does not relate to sentencing; rather, it relates to the exclusion of psychiatric testimony at trial. For example, appellant argues "[t]he problem here, however, is not the implementation of the mandatory minimum statu[t]e, but the judicial branch's rule of evidence that effectively precludes consideration of [expert psychiatric] evidence in the first place." Accordingly, we do not separately analyze Anderson's sentencing due process claim.

Anderson did not assert a mental illness defense, and therefore the trial was not bifurcated. Existing law presumes that during any trial, "defendant[s] standing trial, are responsible for their acts, *i.e.,* that they have the capacity to intend what they do." *State v. Bouwman,* 328 N.W.2d 703, 705 (Minn.1982). "The law recognizes no degree of sanity. Applying socially and morally acceptable standards a line has been drawn—on one side are the legally sane, on the other side are the legally insane." *Id.* at 706. Minnesota does not recognize the doctrine of diminished capacity or diminished responsibility. *See State v. Provost,* 490 N.W.2d 93, 100 (Minn. 1992).

Essentially, Anderson argues that his brain functions differently, and therefore he is less culpable. The court, however, has previously rejected arguments for diminished capacity or diminished responsibility. *Provost,* 490 N.W.2d at 100. Anderson is presumed to have a normal functioning brain and therefore is not permitted to introduce evidence that his capacity to form intent and premeditate was different. Consequently, we conclude that the district court did not abuse its discretion.

Anderson further argues that it was a denial of due process to exclude evidence of his mental disability. Existing case law provides that a defendant's due process rights are not violated by exclusion of psychiatric testimony in the guilt phase of a bifurcated trial. *E.g., Peterson,* 764 N.W.2d at 822; *State v. Bird,* 734 N.W.2d 664, 673 (Minn.2007); *Provost,* 490 N.W.2d at 104; *State v. Brom,* 463 N.W.2d 758, 763–64 (Minn.1990); *State v. Jackman,* 396 N.W.2d 24, 29 (Minn.1986). In *Brom* we noted that both premeditation and intent must be inferred from the totality of the circumstances because they are subjective in nature. 463 N.W.2d at 762–

63. Because premeditation and intent must be inferred from physical evidence related to the particular act, we held that expert psychiatric testimony was not relevant to determining premeditation and intent, and therefore exclusion of such testimony did not violate the defendant's due process rights. *Id.* at 764.

Two years later in *Provost,* we again held that exclusion of psychiatric testimony on mens rea from the guilt phase of a bifurcated trial did not deny a defendant due process. 490 N.W.2d at 104. We viewed psychiatric testimony on the existence and effects of a mental illness as minimally relevant and having little probative value, because the question at the guilt phase is not whether a defendant had the capacity to form intent or premeditation, but whether in fact the defendant had formed intent and premeditated. *See id.* at 102.

Notably, Anderson did not assert a mental illness defense, but he did seek to introduce expert testimony to refute intent and premeditation. Applying our holdings in *Brom* and *Provost,* we conclude that excluding expert psychiatric testimony at trial because it was not relevant to determining premeditation and intent did not violate Anderson's due process rights. While a defendant has a due process right to present a meaningful defense, that right remains subject to the district court's authority to act as a gatekeeper for the admissibility of evidence. We conclude that Anderson's due process right to a fair trial was not violated by the exclusion of such testimony.

Third, Anderson argues that expert psychiatric testimony concerning Asperger's should have been permitted under the two exceptions described in *Provost,* 490 N.W.2d at 103–04. In *Provost,* we held that expert psychiatric opinion testimony on the general effects of mental illness is

generally not admissible during the guilt phase of a trial, except such testimony might be admissible (1) in the very rare circumstance in which "there was a mental disorder characterized by the formation of a particular subjective state of mind inconsistent with the pertinent criminal mens rea," or (2) "where the defendant has a past history of mental illness" and such history "is in the nature of a factual background to explain 'the whole man' as he was before the events of the crime." *Id.* Even if one of the exceptions applies, the district court must still "carefully weigh[ ] the relevancy and probative value of the proffered evidence, if any, against the likelihood of prejudice or confusion," and perform a relevancy and probative value analysis under Minn. R. Evid. 402 and 403. *See Provost,* 490 N.W.2d at 103–04.

■ With regard to the first *Provost* exception, Anderson admits that in general Asperger's does not prevent a person from forming the requisite intent or premeditation, but argues that some aspects of Asperger's impair a person's ability to do so. For example, he contends that a person with Asperger's may focus on so many details that the person is unable to determine the next step that must be taken and take into account cause and effect relationships.

The district court concluded Anderson failed to establish that the condition of Asperger's is inconsistent with the requisite intent or the ability to premeditate. The court concluded that even if the first *Provost* exception applied, the evidence should still be excluded under Minn. R. Evid. 403 because opinion testimony has no probative value in determining whether Anderson did in fact form specific intent and did premeditate. The court also con-

cluded that the probative value of the evidence was substantially outweighed by the possibility that the jury would be confused about whether Anderson could even form intent and premeditate.

We conclude that this case does not meet the requirements of the first *Provost* exception. Based on the record before us, Anderson failed to establish that Asperger's prevents a person from premeditating or forming intent. Thus, we conclude that the district court did not abuse its discretion in excluding evidence under the first *Provost* exception.[9]

■ Anderson argues that expert psychiatric testimony is necessary to explain the "whole man" under the second *Provost* exception. He argues that his lack of diagnosis of Asperger's prior to trial should not be held against him in determining whether the second exception should apply. Anderson argues, in part, that Asperger's was only recently defined as a disorder in the *Diagnostic and Statistical Manual of Mental Disorders* in 1994, and often goes undiagnosed until early adulthood. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 789 (4th ed.1994).

Under the second *Provost* exception, opinion testimony may be admissible where the defendant has a past history of mental illness. But this exception does not apply when the testimony of an expert psychiatric witness is based solely on post-indictment clinical records or evaluation. *See Bird,* 734 N.W.2d at 679 ("[T]he expert psychiatric testimony that may be admitted under this exception concerns the defendant's *past history* of mental illness as evidenced by a clinical mental health record."); *State v. Griese,* 565 N.W.2d 419,

---

9. Our analysis here assumes without deciding that Asperger's is a "mental illness" for pur-

poses of the *Provost* exceptions.

426 (Minn.1997) ("Nowhere in [the doctor's] testimony or its offer of proof did defense counsel offer evidence of the prior diagnosis of [the defendant's] mental illness or clinical records related to [the defendant's] condition before the events of the crime.... [Thus, the] testimony did not relate to 'the whole man' as he was before the crimes."); *State v. Persitz,* 518 N.W.2d 843, 848 (Minn.1994) (concluding that expert testimony that relies solely on post-indictment records and evaluations of a defendant is not within "the whole man" exception).

Anderson's primary care physician in 2002 noted that there were "no current behavioral or emotional concerns." Moreover, the first diagnosis of Asperger's was made by defense-retained experts after Anderson's incarceration. In sum, there is nothing to indicate that Anderson had a past history of any mental illness prior to the crime. Accordingly, the district court did not abuse its discretion in excluding expert psychiatric testimony on Asperger's.[10]

### III.

Anderson argues that the district court abused its discretion by refusing to give his proposed jury instruction, by failing to explain the meaning of premeditation in a jury instruction given in response to a question of the jury, and by

refusing to add his proposed language to the standard jury instruction on premeditation. A district court's refusal to give a requested jury instruction is reviewed for an abuse of discretion. *State v. Persitz,* 518 N.W.2d 843, 848 (Minn.1994). A district court has considerable latitude in selecting jury instructions, *State v. Mahkuk,* 736 N.W.2d 675, 681 (Minn.2007), and in selecting language for jury instructions, *State v. Goodloe,* 718 N.W.2d 413, 421 (Minn.2006). A defendant "is entitled to an instruction on his theory of the case if there is evidence to support it, but the court need not give the requested instruction if it determines that the substance of the request is contained in the court's charge." *Persitz,* 518 N.W.2d at 848. In addition, "the court's charge to the jury must be read as a whole, and if, when so read, it correctly states the law in language that can be understood by the jury, there is no reversible error." *State v. Peou,* 579 N.W.2d 471, 475 (Minn.1998).

Anderson argues that the State was required to prove that the gunshot was not accidental, and that Anderson formed the requisite intent and premeditated. He argues that his proposed jury instruction was necessary to argue his theory of the case. The proposed jury instruction was:

> The defendant is not guilty of the crimes of First Degree Murder or Second Degree Murder if the gun held by the

---

**10.** Anderson also argues that Asperger's is analogous to other situations in which we have allowed expert psychiatric testimony. Although in *State v. Hennum,* 441 N.W.2d 793, 798–99 (Minn.1989), we held that expert testimony about the general characteristics of battered woman syndrome met the helpfulness requirement in Minn. R. Evid. 702 because we concluded that "it would help to explain a phenomenon not within the understanding of an ordinary lay person," such a conclusion does not mean that expert psychiatric testimony is everywhere and always admissible. The district court must still analyze

the evidence under Minn. R. Evid. 402 and 403. *See State v. MacLennan,* 702 N.W.2d 219, 234–35 (Minn.2005) (holding that evidence of battered child syndrome may help explain a phenomenon not within the understanding of an ordinary lay person, but the defendant did not establish the relevance of the expert testimony to his claim of self-defense and was properly excluded). As stated throughout Section II of this opinion, we conclude that the district court did not abuse its discretion in excluding expert testimony regarding Asperger's.

defendant accidently discharged or if the defendant shot the gun with a purpose other than intent to kill. The burden of proof on this issue is on the state. The state must prove beyond a reasonable doubt that the gun held by the defendant: 1) did not accidently discharge; and 2) that the gun was shot with the intent to kill, for the defendant to be guilty of either First Degree Murder or Second Degree Murder. If the state does not so prove, the defendant is not guilty of those charges.

The district court instructed the jury on first-degree premeditated murder and two lesser included offenses, second-degree intentional murder, and manslaughter in the second degree—culpable negligence. The court explained that the State has the burden of showing beyond a reasonable doubt that Anderson acted with intent and premeditation in order for there to be first-degree premeditated murder, and that for second-degree intentional murder, the State had to establish beyond a reasonable doubt that there was intent.

We conclude that the court's instruction on manslaughter in the second degree—culpable negligence—included the substance of Anderson's theory of the case. The instruction allowed Anderson to argue that the gun may have discharged due to an accident.

Anderson next argues that the word "considered" in the jury instruction on premeditation, CRIMJIG 11.02, was confusing to the jury and misleading in determining whether premeditated murder occurred because "considered" implies that an actual decision did not have to take place and that premeditation could occur prior to intent. *See* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 11.02 (5th ed.2006) (hereinafter CRIMJIG 11.02). He contends that the jury's confu-sion is illustrated by the fact that during deliberation the jury sent the following question to the court:

Page 7 of our instructions states "premeditation" means that the defendant considered, planned, prepared for, or determined to commit the act before the defendant committed it. Do all of the underlined items have to be true to determine premeditation or can one of these items determine it? For example, if the defendant "considered" committing the act is this considered premeditation?

A district court has discretion to decide whether to give additional instructions in response to a jury's question on any point of law, and may expand previous instructions, reread the instructions, or give no response. Minn. R.Crim. P. 26.03, subd. 19(3). The court's instruction to the jury, which included the word "considered," is based on Minn.Stat. § 609.18 (2008), which states that premeditation "means to consider, plan or prepare for, or determine to commit...." Moreover, the jury's question on whether one of the terms sufficed, or whether all had to be present, was a grammatical question, not one of confusion over the meaning of the term "considered." Contrary to Anderson's argument, we conclude that "considered" does not lead a jury to believe that an actual decision to kill beforehand need not take place, and we conclude that the court was well within its discretion by simply rereading the jury instruction on premeditation in answer to the jury's question.

Lastly, Anderson argues that CRIMJIG 11.02 materially misstates the law on premeditation, and the district court abused its discretion by refusing to add an additional sentence to the instruction. The court's instruction stated, in relevant part:

Premeditation means that the Defendant considered, planned, prepared for, or determined to commit the act before the Defendant committed it. . . . It is not necessary that premeditation exist for any specific length of time. A premeditated decision to kill may be reached in a short period of time. However, an unconsidered or rash impulse, even though it includes an intent to kill, is not premeditated.

Anderson requested that the court add the following sentence: "To find premeditation, the state must prove that *after* the defendant formed the intent to kill, *some appreciable time passed* during which the consideration, planning, preparation or determination to kill took place prior to the commission of the act." For purposes of the crimes charged, " 'premeditation' means to consider, plan or prepare for, or determine to commit, the act" before it is committed. Minn.Stat. § 609.18. Premeditation requires that some amount of time pass between forming the requisite intent, and the carrying out of the physical act. *State v. Moore,* 481 N.W.2d 355, 360–61 (Minn.1992). In *Moore,* we rejected the notion that premeditation may occur virtually simultaneously with the formation of the intent to kill. *Id.* at 360. We recognized that premeditation requires "no specific period of time for deliberation," but does require that after the defendant formed the intent to kill "some appreciable time" passed during which the defendant premeditated within the meaning of Minn. Stat. § 609.18. *Moore,* 481 N.W.2d at 361.

Pursuant to *Moore,* Anderson argues that the jury instruction given failed to specify that the defendant must first intend to kill and then an appreciable amount of time must pass during which premeditation takes place. According to Anderson, the jury instruction improperly implied that premeditation could take place prior to forming intent to kill.

We had the opportunity to address an argument similar to Anderson's in *State v. Goodloe,* 718 N.W.2d 413, 421 (Minn.2006). In *Goodloe,* the defendant argued that CRIMJIG 11.02 misstated the law as to the amount of time necessary to make a premeditated decision in light of the court's decision in *Moore. Id.* We disagreed, and held that "the pattern jury instruction on premeditation accurately states the law," and that the district court did not err in giving the instruction. *Id.* at 422. In doing so, we stated "[o]ur conclusion in *Moore* that some appreciable time must pass during which the planning, preparation, deliberation, or consideration required by Minn.Stat. § 609.18 occurs does not conflict with the statement in CRIMJIG 11.02 that premeditation may be formed in a 'short period of time.' " *Goodloe,* 718 N.W.2d at 422. We reasoned that "a 'short period of time' constitutes 'some appreciable time,' and the use of the phrase 'a short period of time' in CRIM-JIG 11.02 is not a misstatement of the law as it stands following *Moore.*" *Id.*

For the same reasons, we conclude that CRIMJIG 11.02 accurately states the law and sufficiently indicates to the jury that Anderson must have formed an intent to kill Olson and then premeditated. Therefore, the district court did not abuse its discretion in declining to give Anderson's requested instruction.

## IV.

Anderson argues that the evidence was not sufficient to establish premeditation. When a conviction is based on circumstantial evidence and a defendant challenges the sufficiency of the evidence on appeal, we conduct a two-step analysis. *State v. Andersen,* 784 N.W.2d 320, 329–30 (Minn.2010). First, we must identify the circumstances proved, giving deference "to

the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State." *Id.* at 329 (citation omitted) (internal quotation marks omitted). Second, we independently examine "the reasonableness of all inferences that might be drawn from the circumstances proved," including inferences consistent with a hypothesis other than guilt. *Id.* (citation omitted) (internal quotation marks omitted). Thus, our review consists of determining whether the circumstances proved are "consistent with guilt and inconsistent with any rational hypothesis except that of guilt." *Id.* at 330. "[W]e will not overturn a conviction based on circumstantial evidence on the basis of mere conjecture." *Id.* (citation omitted) (internal quotation marks omitted).

▆▆▆▆ Three categories are relevant in determining premeditation: planning activity, motive, and the nature of the killing. *State v. Hughes,* 749 N.W.2d 307, 313 (Minn.2008). We have stated that planning activity relates to "facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing." *Id.* (citation omitted) (internal quotation marks omitted). Evidence of planning activity includes procuring of the murder weapon and ensuring that the victim will be in a location where intrusion from others is unlikely. *Id.* Proof of motive is not necessary to find premeditated murder, but it can help strengthen a finding that the defendant deliberated about the killing. *See State v. Griese,* 565 N.W.2d 419, 429 (Minn.1997). The nature of the killing can also show premeditation by indicating, among other things, the number of wounds, and "a defendant's concern with escape rather than with rendering aid to the victim." *Hughes,* 749 N.W.2d at 314–

15 (citation omitted) (internal quotation marks omitted). "A single shot squarely in the back can support a finding of premeditation because it indicates that the shooter took careful aim at the victim." *State v. Kendell,* 723 N.W.2d 597, 607 (Minn.2006). Also relevant are the defendant's actions before, during, and after the killing. *State v. Lodermeier,* 539 N.W.2d 396, 398 (Minn.1995).

We next examine the evidence of the three categories of premeditation. As to planning activity, Anderson posted an online service ad on October 22, 2007, looking for a babysitter for a nonexistent 5–year–old girl, and Olson responded to the ad. Anderson posed as "Amy" in response to Olson's e-mail, and after a series of e-mails with Olson, arranged for her to come to his house on the day of the murder when nobody else would be home. Anderson knew the precise time that Olson would arrive due to Olson's voicemail at 8:57 a.m. Anderson procured his father's unloaded gun from his parents' bedroom. At some point, Anderson manually loaded the gun. The gun was a single-action revolver, which required the hammer to be cocked manually, and the trigger to be pulled before it could fire. Anderson had previously completed a training course in gun safety. There was no evidence that Olson got any further than the stairway in the house. A significant amount of Olson's blood was found in front of the stairs and on the first several stairs.

As to motive, an inmate testified that when he asked Anderson why he did it, Anderson responded that he "wanted to know what it felt like." Anderson told another inmate that he would be more famous than the other inmate was. There was no evidence, however, of an actual or attempted sexual assault.

The nature of the murder was a single gunshot near the center of Olson's back.

Olson did not die instantaneously, but likely lived for another 5 to 15 minutes. Anderson did not administer any aid or contact anyone. Anderson attempted to clean up the blood with a towel, broke Olson's cell phone, and tried to dispose of evidence, including Olson's purse, in a park some distance from the house. He also attempted to delete the October 22 online service ad to which Olson had originally responded by e-mail.

Anderson argues that the elaborate e-mail scheme in posing as "Amy" and requesting a babysitter was to lure Olson to the house for some sort of sexual contact. The circumstances proved do not support a reasonable inference that Anderson lured Olson to the house for a sexual encounter. Rather, the circumstances proved were that Anderson lured Olson to his house at a time when no one would be home; that he retrieved a revolver from his parents' bedroom and manually loaded and cocked the hammer; and that upon her arrival at the house he shot her in the back. None of the circumstances proved suggested an accident or an actual or failed attempt to sexually assault Olson.

Thus, the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt. Accordingly, there was sufficient evidence to convict Anderson of first-degree premeditated murder.

Affirmed.

Concurring, ANDERSON, PAUL H., and PAGE, JJ.

STRAS, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

ANDERSON, Justice PAUL H. (concurring).

I agree with our court's decision to affirm the district court but write separately to express my concern with the wording of the pattern jury instruction on premeditation—CRIMJIG 11.02. 10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 11.02 (5th ed.2006) [hereinafter CRIMJIG 11.02].

We have addressed the language in CRIMJIG 11.02 several times during my tenure on our court. When addressing the language in the instruction, we have held, as we do here, that the instruction "accurately states the law." *State v. Goodloe,* 718 N.W.2d 413, 422 (Minn.2006). But when doing so, we have consistently stated that "some appreciable time must pass" before there can be premeditation. *Id.* The more I have contemplated the wording of CRIMJIG 11.02, the more concerned I have become that even though the instruction may be an accurate statement of the law, it may also be misleading and confusing because the word "any" as used in the instruction can have different meanings.

The relevant language from CRIMJIG 11.02, which the district court gave to the jury at Anderson's trial, is as follows:

Premeditation means that the defendant considered, planned, prepared for, or determined to commit the act before the defendant committed it.... It is *not necessary* that premeditation exist for *any* specific length of time. A premeditated decision to kill may be reached in a short period of time. However, an unconsidered or rash impulse, even though it includes an intent to kill, is not premeditated.

CRIMJIG 11.02 (emphasis added). I conclude that the following language in the instruction "It is *not necessary* that premeditation exist for *any* specific length of time" can be misleading and cause confu-

sion, especially when juxtaposed to our requirement that "some appreciable time must pass for there to be premeditation." *Goodloe,* 718 N.W.2d at 422.

The word "any" in some contexts can mean "one, some, every or all without specification." *The American Heritage Dictionary of the English Language,* 81 (4th ed.2006). It can be used to designate a measurable amount. For example:

> 2: [o]ne, some, or all, indiscriminately of whatever quantity: a: one or more— used to indicate an undetermined number or amount <have you [any] money> ... c: a or some without reference to quantity or extent <grateful for [any] favor at all> **3a:** unmeasured or unlimited in amount, number or extent.

*Merriam–Webster's Collegiate Dictionary* 53 (10th ed. 2001) Similarly, Bryan Garner defines "any" as follows: "In a declarative sentence involving a quantitative judgment, it means 'unlimited in amount or extent; to whatever extent necessary.'" Bryan A. Garner, *A Dictionary of Modern American Usage* 45 (1998). *The Oxford English Dictionary* says "With a specially quantitative force = A quantity or number however great or small." *The Oxford English Dictionary* 539 (2d ed.1989).

But in other circumstances, when used with a negative assertion, it can mean "not at all" or "not even one." Garner, *supra,* at 45. More specifically, Garner states that:

> (2) In negative assertions, [any] creates an emphatic negative, meaning "not at all" or "not even one" <it was not in any way improper> <she did not know any member who was at the event>.

*Id. The Oxford English Dictionary* states:

> With a preceding negative (explicit or implicit) it denies of a person or thing without limitation as to *which,* and thus, constructively, of *every* being or thing of

the kind. It thus becomes an emphatic negative, with its unqualified or uncompromising scope brought into prominence = None at all; none of any kind, quantity, or number, even the minutest; not even one. . . .

*The Oxford English Dictionary, supra,* at 539. To me this latter meaning is obviously inconsistent with our case law; therefore, I conclude that this model instruction must be revised because of its potential to mislead or confuse a jury.

I nevertheless would affirm in the case before us. I conclude that the potential confusion created by the wording of the instruction has no significant impact here, but it may be critical in a future case when the facts are different. It is for this reason that I write separately to point out my concern about the wording of CRIMJIG 11.02 and to strongly recommend that the Committee on Criminal Jury Instruction Guides of the Minnesota District Judges Association revise this instruction.

PAGE, Justice (concurring).

I join in the concurrence of Justice Paul H. Anderson.